# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Malik B.-N.*, 2012 IL App (1st) 121706

---

| | |
|---|---|
| Appellate Court Caption | *In re* MALIK B.-N., a Minor, Respondent-Appellee (The People of the State of Illinois, Petitioner-Appellee, v. Kurtina B., Respondent-Appellant). |
| District & No. | First District, First Division<br>Docket No. 1-12-1706 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | November 13, 2012<br><br>January 10, 2013<br>November 13, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings on a petition for an adjudication of wardship, the trial court properly found that respondent minor was abused due to excessive corporal punishment and a substantial risk of injury and that he was neglected due to an injurious environment and should not be returned to his mother, since the State satisfied its burden of proof and the order making the minor a ward of the court was not an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-JA-928; the Hon. Richard A. Stevens, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Arleen Anderson, Assistant Public Defender, of counsel), for appellant.

No brief filed for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), guardian *ad litem.*

Panel

JUSTICE KARNEZIS* delivered the judgment of the court, with opinion.
Justices Cunningham and Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondent Kurtina B. appeals from orders of the circuit court finding respondent's minor son, Malik B.-N., to be neglected and abused under the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/1-1 *et seq.* (West 2010)) and making him a ward of the court. We affirm.

¶ 2                                        Background

¶ 3     On July 28, 2011, the Illinois Department of Children and Family Services (DCFS) took temporary protective custody of 12-year-old Malik. In November 2011, DCFS approved Malik's return home to respondent. On November 20, 2011, DCFS took temporary protective custody of Malik again. The State filed a petition for adjudication of wardship, asserting Malik was abused and neglected. The court held an adjudicatory hearing on the petition for wardship in February 2012.

¶ 4     At the hearing, Chicago police officer Joseph Candella testified he and his partner were called to a fire station on July 28, 2011, at 11 p.m., to investigate a possible child-abuse battery. There they met Malik, who told them he had been battered by his mother, respondent, and had fled his home to seek refuge at the fire station. Respondent then appeared at the fire station. She told Officer Candella she had some disciplinary problems with Malik and had " 'whooped' him" because she was upset that he had not cleaned his room as she had instructed. Respondent was placed in custody. Officer Candella saw visible swelling on Malik's face and scratches on his face, neck and shoulders. He had Malik

_____

*Justice Themis Karnezis, who authored the original Rule 23 order on November 13, 2012, is no longer assigned to this court. Justice Mathias W. Delort has replaced Justice Karnezis on the panel, which panel has granted the State's motion to publish the Rule 23 order. Justice Karnezis remains the author of this opinion.

transported to Mt. Sinai Hospital for treatment.

¶ 5    Hospital records admitted into evidence show Malik reported to hospital staff that he was hit with a belt and fist by respondent, while being held down by his uncle. He had bruising and scratches on his back and neck and was diagnosed as suffering "contusions S/P battery, child abuse."

¶ 6    Ed Vickham, a case manager at Sankofa Safe Child Initiative (Sankofa), testified that he was Malik's one-on-one mentor. Children are referred to Sankofa by DCFS. From September to November 2011, Vickham saw Malik two to three times a month. Malik lived with his grandmother, Debbie B., during this time.

¶ 7    Regarding the July 2011 incident, Malik told Vickham during their first session that he had not made his bed in a timely manner and his mother began to spank him with a belt. Malik said she then began to spank him on other parts of his body with the belt and he pushed her. Respondent then had Malik's uncle hold him down while respondent continued to hit Malik with the belt. Malik told Vickham he broke away from his uncle and ran out of the house to the fire station. During later sessions, Malik repeatedly told Vickham that he was scared to go home and he did not want to go home because his mother was "going to do the same thing."

¶ 8    In mid-September, Sankofa held a family meeting with Malik, respondent, Debbie B. and Malik's two younger siblings. Vickham testified respondent told him she had spanked Malik with a belt because he had not made his bed, he was disobedient and she was disciplining him. Malik repeated what he had told Vickham previously, that respondent hit him with a belt, started hitting him on other parts of his body besides his behind, he pushed her, and his uncle came in and held him down while respondent continued to hit him. When asked whether he would go home with respondent that day, Malik stated "No. Because the same thing will happen."

¶ 9    Vickham testified Malik barely made eye contact with anyone during the meeting and did not make verbal contact with respondent directly. Respondent was initially "okay," but as Malik and Debbie B. began to talk, respondent got angry, rolling her eyes, huffing and puffing, raising her voice and talking under her breath. Sankofa recommended anger management services for respondent. She responded that she did not need anger management and would not go. Sankofa also recommended family counseling but respondent said the issue was Malik's problem, not hers, and she would not participate. On November 18, 2011, respondent phoned Vickham and told him there was no safety plan in place for Malik and she was going to pick Malik up from Debbie B.'s.

¶ 10    Luviana S., respondent's sister, testified that on November 19, 2011, she received a phone call from her mother, Debbie B., telling her Malik had run away. Luviana S. and assorted family members found Malik crying on the street and, after some persuasion, took him back to Debbie B.'s house. Malik told Luviana S. that he did not want to go back home with respondent. Respondent arrived. Debbie B. and assorted relatives told Malik to go home with respondent and do whatever she told him to do but Malik kept repeating that he was not going home. Respondent kept asking Malik what his problem was, why he ran away and what he was angry about.

¶ 11    At some point, Malik and respondent walked to the bus stop to go home. Luviana S. and her family followed them by car to make sure they got on the bus. When Luviana S. got to the bus stop, she saw respondent holding Malik by the front collar of his coat. She was trying to get Malik on the bus but Malik refused. Luviana S. saw respondent try to hit Malik in the face with her fist several times. Luviana S.'s son intervened to stop respondent "swinging" at Malik. Malik had his hands balled up but Luviana S. did not see him swing at or hit his mother. She heard respondent tell Malik, "If you hit me this time, I am going to go to jail because I'm going to kill you." There was a lot of "back and forth" from respondent saying Malik "was going to go to Juvenile" and he would not like that and she hoped they sodomized him there.

¶ 12    Malik and respondent returned to Debbie B.'s. Debbie B. drove them to respondent's home, with Luviana S. and her family following in their car. Luviana S. testified that, when Malik refused to go into respondent's home, respondent grabbed his coat again and backed him up against a tree. Luviana S. then saw respondent take her hand and "like, put his head on the tree." She saw that respondent "threw his head against the tree." Luviana S.'s husband jumped out of the car and tried to calm both Malik and his mother down. Asked whether Malik could have knocked his head on the tree, Luviana S. replied she "saw it with [her] own eyes of his mother take her hand and throw his head into the tree." Responding police officers spoke with Malik for a few minutes but then left. Malik immediately ran away. Luviana S.'s husband told her when he got back into the car that he saw a knot on Malik's left temple. When Luviana S. saw Malik at Debbie B.'s house three days later, he had a knot on his head. Kurtina is over six feet tall and Malik was then five feet nine inches.

¶ 13    Debbie B. testified she picked her grandson Malik up at the hospital on July 29, 2011. He had bruising on his neck and his back. He told her his mother had beaten him and hit him with a belt while his uncle held him down because he had not made his bed or dried some clothes. At the request of DCFS, Malik lived with Debbie B. from that date until November 19, 2011, pursuant to a safety plan. She never had any disciplinary issues with Malik and never had occasion to punish him in any way while he lived with her.

¶ 14    On November 19, DCFS called Debbie B. to tell her Malik could go home to respondent and respondent called to say she was coming to pick him up. Malik ran away when Debbie B. told him he was going home. Debbie B., Luviana S. and assorted relatives found Malik and took him back to Debbie B.'s house. Respondent arrived. Debbie B. told Malik to go home with respondent, to do whatever she said and he would not have any problems, but Malik "just sat there *** crying." He did not want to leave but his family finally persuaded him to go to the bus stop with respondent. Debbie B. did not see what happened at the bus stop but, at some point, everyone returned to her house. She drove Malik and respondent to respondent's home. She learned Malik ran away again that night.

¶ 15    Derek Walker, a caseworker in the DCFS Child Protective Services Division, testified that he was assigned Malik's case on November 20, 2011, in response to a "risk of harm" allegation that Malik was being abused by his mother/respondent. Malik had a previous July 2011 report of cuts, bruises and other injuries inflicted by his mother. Respondent had refused services for that incident. When Walker saw Malik on November 20, Malik had slight puffiness on the left temple. Malik told him the injury was the result of respondent

hitting his head into a tree and had originally been a knot. Malik told Walker he was fearful that if he went back home, the same thing would continue to happen but he would go back if his mother changed her behavior. Malik reported to Walker that there was a history of domestic violence between respondent and Malik's father, Muhammed N., and his parents argued frequently. Malik said that, when he was six or seven years old, he had stabbed his father when his father pointed a gun at his mother and also choked her. Malik's parents did not live together and Muhammad N. told Malik he was not his father.

¶ 16    Walker phoned respondent to discuss the latest allegation. Respondent did not feel she needed services because she had done nothing wrong and was merely disciplining her child and trying to get him to come home. She refused to sign a safety plan allowing Malik to remain with Debbie B. With regard to the July 2011 incident, respondent told Walker that Malik hit her and she responded physically, for discipline.

¶ 17    Walker investigated the November allegation and made a final determination that Malik was at risk of harm from respondent. He took protective custody of Malik on December 7, 2011, finding Malik could not safely be returned home. Malik told him he wanted to live with Debbie B. because he was angry with his father for consistently denying paternity.

¶ 18    At the close of the hearing, the court found that the witnesses were credible and the State had met its burden to show by a preponderance of the evidence that Malik was (1) abused due to the infliction of excessive corporal punishment based on the July 2011 incident (see 705 ILCS 405/2-3(1)(b) (West 2010)); (2) abused due to substantial risk of physical injury based on a November 2011 incident (see 705 ILCS 405/2-3(2)(ii) (West 2010)); and (3) neglected due to an injurious environment (see 705 ILCS 405/2-3(1)(b) (West 2010)). It held that respondent was the perpetrator of the abuse and excessive corporal punishment and found Malik's father, Muhammed N., was noncustodial.

¶ 19    The court held a disposition hearing on May 15, 2012. During the hearing, respondent testified Malik had run away from his foster parent (Debbie B.), was living with his father, Muhammad N., and Muhammad N. wanted him to remain there.

¶ 20    Lisa Gregory, Malik's case manager at service agency One Hope United, testified Malik had been placed with Debbie B. after the November 2011 incident. In early May 2012, he had either run away from Debbie B.'s home or been taken away by respondent and Muhammed N. He had not been back to Debbie B.'s home nor had he attended school since that time. Debbie B. told Ms. Gregory that Malik said he did not want to return to her home.

¶ 21    Muhammad N. told Ms. Gregory he was not going to give his son back to DCFS, did not care what the court order said and would not complete any services. Ms. Gregory did not know where Muhammad N. and Malik were currently residing. She had asked Muhammad N. to come to court that day but he was not there. Ms. Gregory requested a child protection warrant for Malik. The court granted the request and continued the disposition hearing.

¶ 22    During the continued disposition hearing on June 4, 2012, Malik addressed the court in chambers. He told the court he had been living with his father, Muhammad N., for the past few weeks. He did not know the address. He said he left Debbie B.'s house because respondent had come there and started arguing with Debbie B. and he felt responsible for the mother-daughter conflict. He had not attended school since he left Debbie B.'s because

respondent told him if he went to school, DCFS would come and get him. Malik told the court he wanted to live with respondent or Muhammad N. but would feel safest living with Muhammad N. or with Muhammad N.'s mother. The court noted that Muhammad N. was not in court.

¶ 23    Ms. Gregory was recalled. She reported that, pursuant to the integrated assessment prepared for the family, respondent was supposed to do individual therapy. Respondent had attended two sessions but had been discharged by her therapist in April because she missed three sessions, was hostile to the therapist and told the therapist she would come to therapy and sit there for an hour but she had no issues to work on or anything to talk about. A report prepared by respondent's therapist stated respondent "felt that, if the only purpose [of individual therapy] was to convince her not to use corporal punishment, there was something wrong with the system. Because it was her right as a parent to chastise her son as she saw fit." The therapist reported respondent told her "I will come in the office every Friday and sit and look at your face."

¶ 24    More recently, respondent had told Ms. Gregory that she was willing to engage in therapy. Because respondent's original therapist said she would not be able to work with respondent, respondent had been on a waiting list to be assigned a new therapist for approximately one month.

¶ 25    Ms. Gregory testified respondent had completed parenting and anger management classes in March 2012. Records of the classes show she attended all sessions and, although initially resistant, did participate. But when offered additional services, she told the agency she did not want to participate in anything other than what she had completed and was ordered to do. During respondent's most recent supervised visit with Malik, she had little interaction with Malik and ended the session abruptly, stating she had to go. During Muhammad N.'s most recent supervised visit, Ms. Gregory found they seemed comfortable with each other and Malik seemed more open with his father there. Recently, Debbie B. had told Ms. Gregory that, although she had originally intended that Malik remain with her until he was ready to go to his mother or father, she now did not want him to stay with her because of her tension with respondent.

¶ 26    The integrated assessment recommended Muhammad N. participate in a domestic violence assessment but he told Ms. Gregory he would not participate in any services. Family counseling sessions with Malik were recommended, but Malik's individual therapist found him not ready for family therapy. Malik was discharged from individual therapy when he went missing.

¶ 27    Ms. Gregory told the court that both respondent and Muhammad N. would have to participate in some reunification services, individual therapy for respondent and domestic violence assessment for Muhammad N., before she would recommend that Malik return home. Ms. Gregory believed it was in the best interest of Malik that he be adjudged a ward of the court and DCFS be given the right to place him.

¶ 28    Respondent testified again, telling the court that she understood she had to participate in individual therapy to get Malik back and she was willing to do it. She wanted Malik returned to her because he was her son, she loved him and he had to get on with his life and return to

school. Muhammad N. had brought Malik to court that day at her request.

¶ 29 Following the hearing, the court found respondent and Muhammad N. "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline" Malik; reasonable efforts had been made to prevent or eliminate Malik's removal from his home; services aimed at family reunification had been unsuccessful; and it was in Malik's best interest to remove him from the custody of his parents. It adjudged Malik a ward of the court pursuant to section 2-27(1) of the Act (705 ILCS 405/2-27(1) (West 2010)) and placed him in the guardianship of DCFS.

¶ 30 The court stated that, although respondent had completed parenting and anger management services, she needed to participate in individual therapy to address and correct the main issue, excessive corporal punishment, that brought the case to court. Similarly, it held that Muhammad N. needed to participate in the domestic violence assessment and reunification services. Until Muhammad N. and respondent made the required effort, Malik would be placed in DCFS guardianship.

¶ 31 Respondent timely appealed the court's abuse, neglect and disposition findings.

¶ 32 Analysis

¶ 33 Standard of Review

¶ 34 Respondent argues the court's findings that Malik (1) was abused due to excessive corporal punishment; (2) was abused due to substantial risk of injury; (3) was neglected due to injurious environment; and (4) should not be returned to his mother were against the manifest weight of the evidence.

¶ 35 Upon filing of a petition for wardship, in order that the court judge a child a ward of the court, the State must prove the child was abused or neglected by a preponderance of the evidence, *i.e.*, by that amount of evidence that leads the trier of fact to find abuse or neglect is more probable than not. *In re Stephen K.*, 373 Ill. App. 3d 7, 20 (2007); 705 ILCS 405/1-3(1), 2-21 (West 2010). Any case involving an adjudication of neglect, abuse and wardship must be decided on the basis of its own distinct set of facts and circumstances. *In re J.P.*, 294 Ill. App. 3d 991, 1002 (1998). The trial court has broad discretion when determining whether a child has been abused or neglected. *In re Stephen K.*, 373 Ill. App. 3d at 20. We will not disturb the court's findings unless they are against the manifest weight of the evidence, unless they are manifestly unjust or palpably against the weight of the evidence and our review of the record clearly demonstrates that the opposite result was the proper one. *In re Stephen K.*, 373 Ill. App. 3d at 20; *In re J.P.*, 294 Ill. App. 3d at 1000.

¶ 36 Muhammad N. is not a party to this appeal. Accordingly, the court's findings related to Muhammad are affirmed. We will address only the court's findings relating to respondent. For the reasons which follow, the court's findings that Malik was a neglected and abused minor who should be made a ward of the court are not against the manifest weight of the evidence.

¶ 37                                        1. Abuse Due to Excessive Corporal Punishment

¶ 38          The court found that Malik was abused pursuant to section 2-3(2)(v) of the Juvenile Court Act. Section 2-3(2)(v) provides, in relevant part, that an "abused minor" includes any child under age 18 whose parent "inflicts excessive corporal punishment." 705 ILCS 405/2-3(2)(v) (West 2010). The Act does not define "excessive corporal punishment." *In re J.P.*, 294 Ill. App. 3d at 1002. Instead, as noted above, each case involving the adjudication of abuse must be decided on its own facts. *In re J.P.*, 294 Ill. App. 3d at 1002. A parent has the "right" to corporally discipline his or her child, but this right, like any other, must be exercised in a "reasonable" manner. *In re J.P.*, 294 Ill. App. 3d at 1002.

¶ 39          The court found Malik was abused due to excessive corporal punishment inflicted on him by respondent on July 28, 2011. Respondent admits she got angry with Malik for failing to make his bed and "whooped" him with a belt. When Malik resisted, she had his uncle hold him down so that she could continue to hit him with the belt. Hospital records show that Malik reported to hospital staff that respondent had also punched him in the face three or four times with her fist and this was the third time in which respondent had beaten him.

¶ 40          Respondent argues that, as a parent, it is her right to discipline her child and she was disciplining Malik for his disobedience in failing to do his chores as instructed. There is no question respondent has the right to discipline her child by use of corporal punishment. But respondent's "discipline" went far beyond reasonable corporal punishment. Her response to Malik's failure to do his chores was completely out of proportion to the infraction. Respondent asserted she "spanked" Malik, and the court also referred to what she did to Malik as spanking, reflecting respondent's own choice of words. But she did not merely spank Malik. She "whooped" him with a belt and may have punched him in the face. And when he resisted, she had his uncle hold him down so that she could continue the whooping. Her discipline resulted in her 12-year-old son being in such condition that the police called an ambulance to take him to the hospital, where he was treated for bruises and scratches on his neck and back.

¶ 41          Respondent argues that she was justified in her use of force because Malik lashed back at her but there is no evidence to support that he did strike at respondent. Malik told Vickham he pushed his mother but did not hit her. Moreover, even if Malik had struck at respondent, respondent is the adult and her decision to keep whipping him with the belt is extreme. Respondent makes much of the fact that Malik is almost her height. But the fact that he is tall does not excuse or warrant an excess of corporal punishment for what is a minor infraction.

¶ 42          Respondent also argues her actions were warranted because Malik was increasingly difficult to control. Debbie B. testified she had no disciplinary problems with Malik when he lived with her between July 28, 2011, and November 19, 2011. But again, even if Malik did require strong discipline, whipping him with a belt about the body while he was being held down by another adult until he is bruised and scratched is unreasonable corporal punishment. Accordingly, the evidence supports the court's finding that the State met its burden to show by a preponderance of the evidence that Malik suffered abuse due to excessive corporal punishment. The court's findings that Malik was abused pursuant to

section 2-3(2)(v) of the Act and that respondent committed the abuse are not against the manifest weight of the evidence.

¶ 43                                    2. Abuse Due to Substantial Risk of Physical Injury

¶ 44        The court found Malik abused pursuant to section 2-3(2)(ii) of the Act. Section 2-3(2)(ii) provides, in relevant part, that an "abused minor" includes any child under age 18 whose parent "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2010).

¶ 45        The court based its finding on the November 2011 incident in which respondent, angry that Malik refused to enter her home, rammed his head into a tree. Respondent's sister, Luviana S., witnessed the incident. She testified variously that she saw respondent grab Malik by the coat, back him up against a tree and take her hand and "like, put his head on the tree"; saw respondent "throw his head against the tree"; and "saw it with [her] own eyes of his mother take her hand and throw his head into the tree." Luviana S.'s husband reported to her that he saw a knot on Malik's left temple immediately after the incident and she saw a knot on his head three days after the incident. Investigator Walker saw a slight puffiness on Malik's left temple the day after the incident.

¶ 46        The trial court found the witnesses testifying during the adjudicatory hearing credible. It had the best opportunity to observe the witnesses' demeanor and conduct and was in the best position to determine the credibility and weight to be given to their testimony. *In re Stephen K.*, 373 Ill. App. 3d at 20. Nothing in the record leads us to the conclusion that Luviana S. was not credible. Her testimony, although somewhat scattered, was consistent: she saw respondent "throw" Malik's head into the tree when he refused to go into her home. The evidence, therefore, supports the court's finding that Malik suffered an injury to his left temple when his mother forced his head into the tree.

¶ 47        Luviana S.'s testimony, together with the evidence supporting the finding of excessive corporal punishment, shows that respondent was still the same violent person in November 2011, capable of purposefully ramming her 12-year-old son's head into a tree, as she was in July 2011, when she "whooped" Malik so severely he required hospital care. Further, the testimony of Luviana S., Debbie B. and Vickham shows respondent was quick to anger; blamed Malik for the problems between them; disclaimed any responsibility for her violence against Malik; refused to participate in anger management services after the July 2011 incident; swung at Malik; threatened to kill him; and told him she hoped he would be sodomized if he went to juvenile detention. The evidence supports a finding that respondent's actions were not accidental and would be likely to cause Malik's death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function if Malik remained in her custody.

¶ 48        Respondent argues that, because Malik had not lived with her since the July incident and tried to avoid living with her, the State did not prove that Malik suffered abuse due to substantial risk of physical injury from the November 2011 incident. She argues there was no nexus between her indifference to doing intact services after the July incident and a

substantial risk of injury to Malik because he did not live with her and saw her only once a week during supervised visitation. Malik may not have lived with respondent for four months after the July 2011 incident but, on the first day he was returned to her care thereafter, she rammed his head into a tree. Clearly, when Malik was in respondent's care, respondent reacted violently to him and physically abused him and Malik suffered a physical injury as a result. The evidence supports a finding that, if he remained in her care, there was a substantial risk that he would suffer a physical injury that would likely cause impairment of his bodily function or emotional health.

¶ 49 Respondent also argues that, because Malik suffered, at most, scratches and bruises in July 2011 and a knot to the head in November 2011, the State could not show that the severity of his injury indicated that he was living in an environment that exposed him to or threatened him with a substantial risk of physical injury that would likely cause his death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function. The severity of the injuries resulting from respondent's abuse is not the sole indicator of the risk created. Needless to say, any environment in which an adult considers it normal to continuously beat a child with a belt while the child is being held down or to ram a child's head into a tree because he made her angry creates a substantial risk of physical injury.

¶ 50 The court could clearly find that the State proved by a preponderance of the evidence that respondent's actions toward Malik created a substantial risk of physical injury. The court's finding pursuant to section 2-3(2)(ii) of the Act was not against the manifest weight of the evidence.

¶ 51                                3. Neglect Due to Injurious Environment

¶ 52 The court found Malik neglected pursuant to section 2-3(1)(b) of the Act. Section 2-3(1)(b) provides that a "neglected minor" includes any child under age 18 whose environment is injurious to his welfare. 705 ILCS 405/2-3(1)(b) (West 2010); *In re Gabriel E.*, 372 Ill. App. 3d 817, 823 (2007). Because the concepts of "neglect" and "injurious environment" have no fixed meaning and take their content from the particular circumstances of each case, each case involving such allegations must be decided on the basis of its unique facts. *In re Gabriel E.*, 372 Ill. App. 3d at 823. However, as a general rule, neglect is "the failure to exercise the care that circumstances justly demand and encompasses both wilful and unintentional disregard of parental duty." (Internal quotation marks omitted.) *In re J.P.*, 331 Ill. App. 3d 220, 235 (2002); *In re Gabriel E.*, 372 Ill. App. 3d at 822.

¶ 53 The same evidence that supports the abuse due to excessive corporal violence and substantial risk of physical injury findings supports the court's finding that the State proved, by a preponderance of the evidence, that Malik was neglected due to an injurious environment. Based on the evidence, the court could find respondent created an injurious environment for Malik, that her actions and attitude resulted in her failure to exercise the care that the circumstances demanded, resulting in a breach of her duty to provide a safe environment for her son. The court's finding of neglect due to an injurious environment was not against the manifest weight of the evidence.

¶ 54                              4. Ward of the Court

¶ 55      The court adjudged Malik a ward of the court pursuant to section 2-27(1) of the Act. It found respondent and Muhammad N. unable for some reason other than financial circumstances alone to care for, protect, train, or discipline Malik; reasonable efforts had been made to prevent or eliminate Malik's removal from his home; services aimed at family reunification had been unsuccessful; and it was in Malik's best interest to remove him from the custody of his parents.

¶ 56      Section 2-27(1) provides that "a trial court may commit a minor to wardship upon a determination that the parent is unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor and that the health, safety, and best interests of the minor will be jeopardized if the minor remains in the custody of the parent." *In re Gabriel E.*, 372 Ill. App. 3d 817, 828 (2007); 705 ILCS 405/2-27(1) (West 2010). We will reverse the court's determination only if its factual findings at the disposition hearing are against the manifest weight of the evidence or if it abused its discretion by selecting an inappropriate dispositional order. *In re Gabriel E.*, 372 Ill. App. 3d at 828. The court's findings were not against the manifest weight of the evidence and it did not abuse its discretion in adjudging Malik a ward of the court.

¶ 57      The evidence shows that the integrated assessment required respondent to complete individual therapy and family counseling. Respondent did not complete the individual therapy and, as a result, did not participate in family counseling. Respondent did not complete the required therapy because, as caseworker Gregory testified and the therapist's report showed, respondent refused to cooperate with the therapy. She attended two individual therapy sessions, but told her therapist that she did not need counseling and could discipline Malik as she pleased. She then missed the next three sessions and told her therapist on the phone that she did not need any therapy, would not cooperate with therapy and, although she would show up for the sessions, would essentially just sit there and stare at the therapist. Due to respondent's lack of cooperation, the therapist then discharged her.

¶ 58      Respondent argues that the reason she has not completed individual therapy is because caseworker Gregory was out of the office for a month and, therefore, did not assign respondent to a new therapist as soon as respondent phoned and requested reinstatement of the therapy service. Just as respondent blames Malik for her violence against him and the resulting consequences, she blames the therapist and caseworker for her noncompletion of individual therapy. But the reason respondent did not complete individual therapy is because of her own actions, because of her refusal to cooperate with the therapist and actively participate in the necessary individual therapy. She has no one to blame but herself for the fact that she did not complete the therapy.

¶ 59      The evidence shows that respondent loves Malik, wants him home and has completed a parenting and an anger management class toward that end. But she has not completed the necessary individual and family therapy services for reunification with Malik. As a result, she has not addressed the underlying causes of her excessive corporal punishment and Malik's injuries, or the reason for his placement with DCFS. She has not addressed her anger and violence toward him. Respondent's supervised visits with Malik remain awkward,

sometimes contentious, and Malik is afraid of her. She has not completed individual therapy and the family is, therefore, not ready for family counseling.

¶ 60        Because respondent has not completed individual therapy, the evidence supports the court's finding that respondent is unable to care for, protect, train or discipline Malik for reasons other than financial circumstances alone and that the health, safety, and best interests of Malik will be jeopardized if he is in her custody at this time. The factual findings underlying the court's disposition order are not against the manifest weight of the evidence and the court did not abuse its discretion in adjudging Malik a ward of the court and placing him in the custody of DCFS.

¶ 61                                      Conclusion

¶ 62        For the reasons stated above, we affirm the orders of the trial court (1) finding Malik abused and neglected, Muhammad N. to be noncustodial and respondent to be the perpetrator of the abuse and excessive corporal punishment; and (2) adjudging Malik a ward of the court.

¶ 63        Affirmed.