2023 IL App (1st) 221724-U

FOURTH DIVISION
Order filed: June 1, 2023

No. 1-22-1724

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* N.P, M.P., K.B., and A.B., minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 20JA875, 20JA876, |
| | ) | 20JA877, 20JA878 |
| v. | ) | |
| | ) | |
| Lorraine A., | ) | Honorable |
| | ) | Shannon P. O'Malley, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Disposition order placing minor children under the guardianship of the Department of Children and Family Services is affirmed where the children's former guardian made only a general objection to the continuance of the adjudicatory hearing, thereby failing to preserve the issue, and where the removed guardian failed to participate in recommend services that were aimed at remedying the reasons for the removal of the children from her care.

¶ 2    Appellant Lorraine A., who was the former guardian of sisters N.P., M.P., A.B., and K.B. (collectively "the Children"), appeals a circuit court judgment adjudicating the Children wards of the court, removing the Children from her care, and placing the Children in the guardianship of the Department of Children and Family Services (DCFS). Lorraine contends that the wardship adjudication cannot stand because the court improperly granted the State a continuance of trial and that the disposition must likewise be vacated because Lorraine was the better placement option. We see no merit to either of Lorraine's issues and affirm the circuit court's judgment.

¶ 3    Before addressing the facts of the case and the issues on appeal, we must address the delays in the resolution of this appeal. In accordance with the provisions in Illinois Supreme Court Rule 311(1)(a) (eff. July 1, 2018), this order was due more than a month ago, on April 17, 2023. The certified record was due to be filed on December 22, 2022, but was not actually filed in this court until two weeks later, on January 5, 2023. Lorraine's initial brief was due to be filed on January 27, 2023, but the Public Defender requested and was granted a one-time continuance to March 3. Despite being granted that extra time, Lorraine filed her brief instanter an additional week later on March 9. The State's and the Public Guardian's briefs were due on March 30, yet both requested and were granted one-time extensions to April 28. At this point, the deadline for our decision came and went. The Public Guardian then filed his brief on time on April 28, but the State did not file its brief until May 10. Lorraine then followed with her reply brief on May 17.

¶ 4    We remind the parties that time is of the essence in cases involving the welfare and placement of children and delays in briefing such as existed in this case should not be the norm.

¶ 5    In June 2020, the State filed four petitions for adjudication of wardship asserting that Lorraine was abusing and neglecting the Children. At that time, the Children were 17, 15, 13, and

11 years old. The State alleged in the petitions that the Children had reported being locked in the basement of Lorraine's house and could only communicate with Lorraine through an intercom; they were only allowed out of the basement and into the house to eat dinner. According to the State, in case of an emergency, the Children would only be able to escape through a window or a back door that was sometimes locked. The State also alleged that Lorraine had hit the Children with a belt. The Children's mother is deceased, and their fathers were either incarcerated or unknown. The State's petitions were accompanied by an affidavit from DCFS investigator Latosha Barnes reiterating the allegations in the petitions.

¶ 6    On June 5, 2020, the circuit court entered a temporary custody order placing the Children in the care of DCFS. Lorraine was granted supervised visitation with the Children if the Children wanted to have contact. Following a series of continuances while the State attempted to locate the father of A.M., K.B., and M.P., on August 15, 2021, all parties waived the 90-day adjudicatory hearing time limit imposed by section 2-14 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-14 (West 2020)).

¶ 7    Following two more continuances, the parties appeared for a scheduled adjudicatory hearing on February 14, 2022. At the start of the hearing, the State requested yet another continuance. The State explained that it had just learned earlier that morning that victim sensitive interviews (VSIs) had been conducted with each of the Children, and the State wanted time to obtain them. Lorraine objected to the continuance. The court granted the continuance, and the adjudicatory hearing was eventually set for April 15, 2022, before being continued twice more to May 27, 2022, and then June 8, 2022.

¶ 8    On June 8, two years after the State filed its petitions for adjudication of wardship, the adjudicatory hearing finally commenced. Before taking any testimony, the court admitted the four VSIs into evidence. Latosha Barnes, a child protective investigator for DCFS testified first. Barnes testified that she was assigned to the Children's case in May 2020 following a hotline report alleging that the Children were being abused and neglected by Lorraine. After speaking with the person making the report, Barnes then contacted and spoke to Lorraine over the phone. Lorraine was unable to take part in an interview at that time, but she did report to Barnes that M.P. had run away from home.

¶ 9    Barnes located M.P. and interviewed her at a relative's home. During that interview, M.P. reported to Barnes that she was being physically and sexually abused by Lorraine. Specifically, M.P. stated that Lorraine had ripped off her shirt and inappropriately touched her breast and vagina area. M.P. also reported that Lorraine locked the Children in the basement. M.P. stated that she did not wish to return to Lorraine's house due to the abuse that she was receiving.

¶ 10    On June 1, 2020, Barnes spoke with Lorraine over the phone. Lorraine was aggressive and combative with Barnes because Barnes would not tell Lorraine where M.P. was located. Due to this aggression, Barnes felt it necessary to be accompanied by law enforcement when she visited Lorraine's home on June 3.

¶ 11    During that June 3 visit, Barnes entered the basement and saw that it had a shower, a toilet, a sink, and four beds. Barnes also observed a freezer that was locked. Barnes did not see any smoke or carbon monoxide detectors, and there was no television. The basement had windows, but in Barnes' opinion the Children would need a ladder to reach them in case of an emergency. On the door to the basement, Barnes found two locks: "One was a latch leading to the basement. And the

other one was a lock that you needed to use a key. It was on the side where [Lorraine] can access only, not [the Children]." Barnes testified that if the Children wanted to come upstairs on their own, they would not have been able to.

¶ 12    Three of the Children were present at the home during Barnes' visit, and Barnes spoke with each of them individually and out of Lorraine's presence. Barnes observed that the Children were clean and dressed appropriately. Collectively, the Children told Barnes that Lorraine locks them in the basement and only allows them upstairs to eat, which Lorraine announces through the intercom. N.P. confirmed that they would have to climb out of the window in an emergency, and she further stated that Lorraine had hit her with a belt a few months earlier. A.B. told Barnes that on one occasion Lorraine had locked them in the basement for hours while Lorraine was at the hospital, and A.B. further reported that Lorraine had spanked her as punishment for misconduct at school. According to Barnes, two of the Children also stated that Lorraine had an alcohol problem and was especially mean when she drinks. As a result of this report about Lorraine's drinking, Barnes "referred her to an agency and the results were positive."

¶ 13    Based on what she learned during her June 3 visit to the home, Barnes and her supervisor made the decision to take protective custody of the Children. Barnes explained that the decision was a result of the Children being locked in the basement and the Children stating that they did not feel safe in the home.

¶ 14    On cross-examination, Barnes testified that Lorraine denied the reporter's allegations. Lorraine told Barnes that M.P. had physically attacked her and ran away after she discovered that M.P. had snuck an older male into the home at 3:00 a.m. Lorraine told Barnes that M.P. had run away in the past and that she had been attempting to get M.P. into the Mercy Home for Boys and

Girls just before the outbreak of the COVID-19 pandemic. Barnes also acknowledged that two prior DCFS cases involving Lorraine and the Children had been closed following a determination that the Children were safe. When asked further about the doors and locks keeping the Children in the basement, Barnes testified as follows:

"Q. [N.P.] also told you that there was a back door that led to the side yard of the home that they could get out of, correct?

A. That's correct.

Q. And at this point, I'm just curious. You knew at this point that there was another door that these children had told you that they could get out of. But, you did not put that in your affidavit when you screened this case in, correct?

A. I don't recall if I did. But, there was another door that had a lock on it.

Q. And that lock is actually locked from the inside, correct?

A. Correct.

Q. And that -- so, this is the side door that is already in the basement, correct?

A. No. It was not actually in the basement. From my observation, the minors had to come up some steps.

Q. But, there was no door with a lock on it blocking them from getting to the side door?

A. There was.

Q. I'm sorry.

A. Yes. There was a door.

Q. With a lock on it?

A. With a lock on it.

Q. Now, is this the door leading down the basement steps into the basement?

A. So, there was 1, 2, 3 separate set of steps to get down to the basement to the sleeping quarters of the minors.

Q. So, again my question is, is this the door that you are saying has a lock on it? Is it the door that leads -- that's at the upper level of the house that leads down to the basement?

A. There is another door. It's two doors.

Q. And where is this other door with the lock on it?

A. The other door with the lock on it is facing the back of the home."

¶ 15    Following cross-examination, the court attempted to clarify the layout of the doors:

"THE COURT: *** When the children were in the basement, did they have to go outside of the door -- the room that they were locked in in order to get to the side door?

THE WITNESS: They would have to come up some steps, your Honor, from my memory. And that door was locked and needed a key.

THE COURT: Okay. But, that door was not contained in the same -- was it or was it not contained in the same room that the children were sleeping in?

THE WITNESS: No, your Honor. It was not in the same room.

THE COURT: Okay. So, what you are saying is, they were in a room that was locked that they slept in. And to get to the side door that was locked from the inside, they -- that still required a key, they would have to go outside of the room that was locked and then go up three steps or more to get to the side door to get out, is that right?

THE WITNESS: Yes, your Honor."

Following the completion of Barnes' testimony, the State rested its case.

¶ 16    Lorraine first called child protection investigator DeAngela Denham, who testified about her involvement with Lorraine and the Children regarding a report in October 2018. The report alleged a substantial risk of harm to M.P., but Denham ultimately concluded that the concern was unfounded. During her investigation, Denham met with M.P., who stated that Lorraine had hit her with a belt and that she did not want wish to return home. Denham did not observe any bruises or injuries, and after their discussion, M.P. ultimately decided to return home. Denham also spoke with Lorraine, who explained that M.P. was repeatedly acting out and not listening. Lorraine asked Denham if DCFS had any services that could help, and Denham agreed to open an "intact" case and provide M.P. with individual therapy. Although Denham did not continue to participate in the case on a regular basis from that point, it was her understanding that M.P. had participated in the offered therapy.

¶ 17    As part of her investigation, Denham also visited Lorraine's home in October 2018. Denham described the basement as being like a dorm room, with sheets hanging over a line separating each child's bed. Denham remembered there being three doors off of the basement stairs: "So, you would go to back of the home. You would go through a door. You go down the stairs. Right at the first bottom of the stairs, there is a door that goes outside the home. But, if you turn and continue down the stairs, then there is a door where you go in -- that goes inside the basement." Denham did not notice any locks on the door that led outside to the yard. During her visits to the home, Denham did not see any indication that the Children were locked in the basement and had no way of getting out, and when she spoke with the Children individually, they did not report being locked in the basement.

¶ 18    Lorraine also called Alexandria Phillips, a child protection investigator who was assigned to the Children's case following another report in September 2019. Phillips testified that M.P. was

hospitalized following an altercation, and DCFS was notified after Lorraine did not come to pick up M.P. from the hospital in a timely manner. Phillips spoke with Lorraine, who explained that she had been involved in an altercation with M.P. and that she did not pick up M.P. from the hospital right away because she does not drive at night. Lorraine stated that M.P. had physically attacked her., and she told Phillips that M.P. was physically aggressive towards her and was not always taking her medication.

¶ 19     M.P. was not willing to speak with Phillips, but N.P. was. N.P. told Phillips that M.P. has an "attitude problem" and that M.P. and Lorraine "got into it," after which M.P. left the home. N.P. reported that she felt safe at home, and when Phillips spoke with K.B. and A.B. they also did not report any safety concerns. Phillips visited the family home in November 2019, and she did not recall having any issues with the home. The investigation closed in 2019.

¶ 20     Lorraine then testified on her own behalf. The Children moved into her home in 2014 and she became their legal guardian in 2015. Lorraine described the doors off of the basement steps as follows: "From upstairs in the family room, you open the door and go down about five steps. And you reach the landing. And straight in front of you is the door to go outside. If you turn right twice, you will go down five more stairs. And on your left is the door to enter the basement." Lorraine testified that neither the lower door into the basement nor the door to the outside had locks on them. Lorraine explained that she had the lock installed on the door at the top of the stairs when a family friend had moved into the basement years before the Children arrived.

¶ 21     Lorraine acknowledged using the lock on the top door when the Children were in the basement "[m]ostly to keep [M.P.] from coming upstairs. She would steal stuff that was dangerous. Skewers that you use like on the grill, my medication. And just rifling in everything. She took little stuff to school that she wasn't supposed to take out of the kitchen junk drawer. It was just constant."

Lorraine stated that she would lock the door when she would go outside to work in the garden in the summer. If the Children needed anything, they could use the door to the side yard, which was only locked from the inside. According to Lorraine, the Children used the side door as their main entry and exit and used that door to come and go from the home. Lorraine testified that there was never any time when both the top door and the side door were locked in a way that would prevent the Children from getting out.

¶ 22   When asked about the reason for the present investigation, Lorraine explained that she had learned that M.P. had snuck a man into the basement at 2:00 or 3:00 a.m. and when she tried to talk about it with M.P., M.P. pushed her down onto the floor and left. After M.P. left the home, Lorraine filed a missing person report with the police. When Barnes came to visit the home on June 3, 2020, Lorraine told her that the locks were not being used and that if Barnes had a problem with the locks Lorraine would take them off right away.

¶ 23   Lorraine explained that, in the fall of 2019, she began attempting to get M.P. into the Mercy Home for Boys and Girls ("Mercy"). Lorraine testified that she went through a lot of effort and interviews to get M.P. enrolled. M.P. was in favor of going to Mercy and had attended interviews with Lorraine. However, about one week before M.P. was scheduled to move into Mercy, the COVID-19 lockdowns began, and the school shut down.

¶ 24   When she spoke with Denham in 2018, Lorraine told her that she could not handle M.P. and that it had gotten to the point that she was scared of M.P. According to Lorraine, M.P. would "beat[] and "push[]" her. As a result, Lorraine requested help from DCFS. M.P. started seeing a therapist and a psychiatrist, which helped for a period of time, but never lasted for long.

¶ 25   Lorraine testified that neither Denham nor Phillips had expressed having any issue with the locks on the doors or the layout of the basement and that nothing had changed regarding that

setup between those investigations and the most recent investigation conducted by Barnes. Lorraine also explained that the intercoms were a gift from her sister who had noticed that she and the Children had to yell when speaking to each other across the house.

¶ 26    Following argument from the parties, the circuit court found that all of the Children had been abused or neglected due to a lack of care, an injurious environment, and a substantial risk of physical injury. The court primarily based its ruling on testimony indicating that the Children could not escape the basement if there were an emergency. The court also expressed concern about the lack of smoke or carbon monoxide detectors. After the court made its ruling, the parties waived the 30-day deadline for the dispositional hearing, which the court set for September 2, 2022.

¶ 27    On July 8, 2022, Lorraine filed a motion to reopen proofs, asserting that she wished to present evidence that there were in fact smoke and carbon monoxide detectors in the upstairs and basement areas of the home and that there was no lock on the door at the bottom of the stairs. The court held a hearing on the motion on September 2 at which it granted the motion to the extent that it allowed the admission into evidence of photos of the smoke and carbon monoxide detectors. However, the court denied Lorraine's request to introduce photos of the locks on the doors. The court noted that the new evidence had no effect on its rulings on the issues of abuse and neglect.

¶ 28    The court held a disposition hearing on October 28, 2022, at which it heard testimony from one witness, caseworker Stephanie Rangel from Unity Parenting and Counseling ("Unity"). Rangel testified that Lorraine was assessed for reunification services at the outset of the case, and that assessment led to recommendations for individual therapy, a parenting/coaching nurturing program, family therapy, a substance abuse evaluation, random drug screens, and a recovery coach. Rangel stated that, on February 10, 2022, Lorraine was referred to an agency named EPIC for individual therapy. However, according to Rangel, Lorraine had not engaged in that service.

Rangel testified that, when she spoke to Lorraine in November 2021, Lorraine "did not believe she was in need of any services."

¶ 29    Rangel testified that, "a few months" prior to the October 2022 dispositional hearing, she made a request to Lorraine's counsel to speak with Lorraine "to set up a child and family team meeting to discuss services and a visitation plan," but that she had been unable to make contact with Lorraine. Rangel stated that Lorraine had not submitted to the substance abuse assessment and had not begun the recommended parental education and coaching course.

¶ 30    According to Rangel, there was no visitation schedule in place. The last visitation between Lorraine and any of the Children was in October 2021, when A.B. and K.B. were living with Lorraine's daughter, Mary. In October 2021, Mary requested that the two children be removed from her home after one of them had harmed one of Mary's pets. Rangel testified that, as of the time of the dispositional hearing, M.P. was in a "fictive kin placement," A.B. was in a licensed DCFS home, and K.B. and N.P. were in a relative's home.

¶ 31    Rangel testified that Lorraine had not visited with N.P. since she was assigned to the case in August 2021. N.P. reached out to Lorraine by phone, but Lorraine "cursed her out" and the two have not spoken since. M.P. likewise had not had any visits with Lorraine during Rangel's time on the case, and M.P. had not had any phone contact with Lorraine because neither one of them wanted to speak to the other. A.B. and K.B. last visited with Lorraine in October 2021, and neither had any phone contact with Lorraine since. According to Rangel, Lorraine had not reached out to request any type of visitation with any of the Children.

¶ 32    Rangel reported that, at the time of the disposition hearing, N.P. was twenty years old and living with a friend and her family. There was no sign that N.P. was being abused or neglected in that household. N.P. had not shown any desire to engage in her recommended individual therapy.

N.P. graduated from high school and was working with Unity on obtaining a stable job. N.P. was staying in contact with her sisters, and they had visited each other on several occasions. N.P.'s father was unknown.

¶ 33    M.P. was living with a friend and the friend's parents, which Rangel believed to be a safe and appropriate placement. M.P. was recommended for individual therapy, psychiatric treatment, family therapy, and a substance abuse assessment, and she was actively engaging with her individual therapy. Regarding the psychiatric treatment, M.P. was hospitalized in February 2022 for suicidal ideation and self-harm. The hospital conducted a psychiatric evaluation and recommended aftercare psychiatric services. M.P. was actively meeting with her psychiatrist every two or three months, and although she was prescribed psychiatric medication, she had not been consistently taking it. Rangel testified that she had recently spoken with M.P. and her foster parent, and M.P. stated that she was willing to undergo the recommended substance abuse evaluation. M.P. was in twelfth grade and was regularly attending class virtually. M.P.'s father was incarcerated, and M.P. was having occasional but irregular contact with him.

¶ 34    A.B. was living in a licensed foster home. She was recommended for individual therapy but had been refusing to engage because she does not like speaking with people she does not know. Rangel had spoken with A.B. about therapy and A.B. understands that it is always available if she ever wants to engage. A.B. was fifteen years old at the time of the dispositional hearing and was in tenth grade. She was doing well in school and was on the track team. Rangel believed that her placement was safe and appropriate. Her father was incarcerated, and she had only one phone call with him.

¶ 35    K.B. was thirteen years old at the time of the hearing and was living with her half-sister. She was recommended for individual therapy, but, like A.B., she had refused to engage with that

service. K.B.'s father was incarcerated and, again like A.B., she had only one phone call with him. Rangel believed that K.B.'s placement was safe and appropriate, and K.B. was doing well in school and attending advanced classes.

¶ 36    Ultimately, Rangel recommended that the Children all be made wards of the court. She believed that to be in their best interest and in the best interests of the public. Rangel asked that the DCFS guardianship administrator be appointed as the Children's guardian and administrator.

¶ 37    When asked on cross-examination whether "any of the girls expressed a desire to have more contact with [Lorraine]," Rangel responded, "They have not expressed that to me." Elaborating further on that point, she explained, "Every time that I see the children in their placement, we speak about if they want to have a phone call or if they want to visit with [Lorraine], and they have always expressed no."

¶ 38    Following the conclusion of testimony and argument from the parties, the court found that it was in the Children's best interests that they be made wards of the court. The court based its ruling on Lorraine's refusal to engage in recommended services and on the Children's desire to not return to her home. The court found Lorraine and the Children's fathers to be unable and/or unwilling to parent the Children. Accordingly, the court appointed the DCFS guardianship administrator as the Children's guardian with the right to place the Children. This appeal follows.

¶ 39    Lorraine raises two issues in this appeal. First, she contends that the circuit court abused its discretion in granting the State a continuance on the day of the adjudicatory hearing scheduled for February 14, 2022. Lorraine argues that the State failed to comply with procedural requirements and failed to demonstrate sufficient cause for the last-minute continuance. Second, Lorraine asserts that the circuit court abused its discretion in determining that it was in the

Children's best interests to be placed in the guardianship of DCFS, rather than being placed with her. We see no merit to either argument.

¶ 40    Lorraine first contests the circuit court's decision to grant the State's request for a continuance on the morning of the February 14, 2022, adjudicatory hearing in order to allow the State to obtain and view the Children's VSIs. Lorraine argues that the State was not entitled to a continuance for two reasons: (1) the State did not comply with procedural requirements because it did not file an affidavit supporting the motion as required by Supreme Court Rule 231 (eff. Jan 1., 1970); and (2) the State did not provide "especially grave reasons" for needing the continuance. We review the circuit court's decision granting a continuance for an abuse of discretion. *In re Parentage of I.I.*, 2016 IL App (1st) 160071, ¶ 29 (citing *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 22)).

¶ 41    Lorraine is correct that subsection (a) of rule 231 provides that "[i]f either party applies for a continuance of a cause on account of the absence of material evidence, *the motion shall be supported by the affidavit of the party so applying or his authorized agent*." (Emphasis added.) And Lorraine is also right that, "[a]fter a case has reached the trial stage, a party requesting a continuance must provide the court with 'especially grave reasons' for needing the continuance due to the potential for inconvenience to the witnesses, parties, and the court." *In re Parentage of I.I.*, 2016 IL App (1st) 160071, ¶ 30 (citing *K&K Iron Works*, 2014 IL App (1st) 133688, ¶ 23). However, Lorraine is precluded from presenting these arguments on appeal because she did not properly preserve them below.

¶ 42    " 'It is a fundamental rule of law in Illinois that a party desiring to preserve a question for review must make appropriate objection in the court below, and that a failure to object to preserve a question for review constitutes a waiver.' " *Obermeier v. Northwestern Memorial Hospital*, 2019

IL App (1st) 170553, ¶ 131 (quoting *Brown v. Timpte Inc.*, 137 Ill. App. 3d 1053, 1062–63 (1985)). " 'Objections should be sufficiently specific to inform the court of the ground for the objection, and a general objection, if overruled, will not preserve the issue for review on appeal." *Id.* (quoting *Carlson v. City Construction Co.*, 239 Ill. App. 3d 211, 239 (1992)).

¶ 43    In this case, Lorraine made only a general objection to the State's request for a continuance. Specifically, her counsel explained her objection as follows: "Your Honor, I am objecting to the continuance. We are answering ready today. This trial has been set for a few months now and we're ready to proceed. While I understand [the assistant state's attorney's] request and I appreciate her bringing this to our attention ahead of time, I do object for the record." Lorraine's counsel did not mention rule 231(a)'s affidavit requirement, nor did she specifically allege that the State had failed to present sufficiently grave reasons for the delay. She merely made a general objection, and such an objection is insufficient to preserve the matter for review. See *People v. Thompson*, 114 Ill. App. 3d 662, 666 (1983) (holding that counsel's statement, "Judge, I object to that instruction to the jury at this time," was a general objection that was insufficient to preserve the issue for appellate review). Accordingly, Lorraine has forfeited her challenge to the circuit court's ruling granting the State's request for a continuance.

¶ 44    Forfeiture aside, we would see no abuse of discretion in the court's decision to grant the continuance. The State requested the continuance in order to obtain and review the Children's VSIs, which were important pieces of evidence. Naturally, the Children's own words carry great weight, and the court was justified in permitting a delay in order to obtain the videos. Although the State did not support its request with an affidavit, "[t]he appellate court *** has been willing to dispense with an affidavit in some cases." *In re S.B.*, 2015 IL App (4th) 150260, ¶ 24. This

would be such a case. The court understandably wanted to see what the Children had to say in their VSIs, and its decision to grant the continuance was not an abuse of discretion.

¶ 45     In her second issue on appeal, Lorraine challenges the circuit court's decision to place the Children in the care of DCFS rather than with her. She argues that the Children's well-being deteriorated under DCFS' temporary custody, specifically noting that one of the Children had hurt a family pet and that another was hospitalized for suicidal ideations. Lorraine contends that no such event had happened while the Children were living with her and that the only thing that she needed to correct was to keep the basement door unlocked. Accordingly, Lorraine argues that placement with her was in the Children's best interests. However, in light of her failure to engage with her recommended services and to address the reasons for the Children's removal, Lorraine has not demonstrated that the circuit court abused its discretion in placing the Children with DCFS.

¶ 46     Under section 2-21(2) of the Act, once a court makes a determination that a child has been abused or neglected, the court shall then hold a dispositional hearing at which it "shall determine whether it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." Section 2-22(1) of the Act further provides that, at the dispositional hearing, after the court determines that a child should be made a ward of the court, "the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." Section 2-23(1)(a) sets forth the disposition options available to the court, which include, in relevant part, (1) continuing in the custody of the child's guardian, (2) being placed with another party in accordance with section 2-27 of the Act, (3) being restored to the custody of the child's guardian on the condition that the guardian cooperate with DCFS and comply with the terms of an after-care plan, or (4) being partially or completely emancipated. Section 2-23(1)(a) also provides that, when a child is found to have been abused or neglected by

their guardian, the child shall not be restored to the custody of the guardian until the court has held a hearing on the best interests of the child and the fitness of the guardian and until the court finds that the guardian is fit to care for the child. If the court finds that the child's guardian is either unable to unwilling to care for the child and that the child's health, safety, and best interests would be jeopardized if he or she remained with the guardian, the court may, among other options, place the child in the care of DCFS. *Id.* § 2-27(1)(d).

¶ 47     At all times "the court's primary concern is the best interests of the children involved." *In re Juan M.*, 2012 IL App (1st) 113096, ¶ 49 (citing *In re Marcus H.,* 297 Ill. App. 3d 1089, 1095 (1998)). And a circuit court's finding that a parent or guardian is unable or unwilling to care for a child will be reversed "only if the factual findings at the dispositional hearing are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *In re Gabriel E.*, 372 Ill. App. 3d 817, 828 (2007). In this appeal, Lorraine does not challenge the circuit court's findings of fact, but rather argues that the court selected an inappropriate disposition by placing the Children with DCFS rather than with her. Accordingly, we review the court's placement decision for abuse of discretion. See *id.*

¶ 48     Lorraine bases her argument on what she maintains has been a deterioration of the Children's psychological health and development. She notes that, after being removed from her care and placed in other homes, one of the Children harmed a family pet and another was hospitalized for suicidal ideation. She maintains that no such events occurred while the Children were living with her. She also argues that it has been detrimental to the Children's mental health to have them separated in four different homes rather than together at her home. She further argues that all she needed to do to remedy the cause for the removal of the Children from her home was

to remove the locks from the door to the basement, which she claims she was willing to do. However, we find Lorraine's arguments unpersuasive.

¶ 49    Although the primary basis for the court's findings that the Children had been abused and neglected was Lorraine's use of the locks to keep the Children in the basement and out of the house, that was not the only issue that Lorraine needed to remedy. DCFS assessed that Lorraine needed individual therapy, parenting education and coaching, family therapy, and a substance abuse evaluation, and she refused to engage in any of those services. DCFS deemed these services appropriate because, in addition to stating that Lorraine locked them in the basement, the Children also told DCFS investigators that Lorraine had an alcohol problem and would spank them or hit them with a belt. The Children also said that Lorraine was especially mean when she drank. Yet, Lorraine refused to engage with her recommended services, and caselaw establishes that a parent or guardian's refusal to participate in services aimed at remedying the reasons for a child's removal is a sufficient basis to place a child with DCFS, rather than with the parent or guardian. See *In re Malik B.-N.*, 2012 IL App (1st) 121706, ¶¶ 59–60 (holding that placement with DCFS was not an abuse of discretion when the parent had failed to complete services that were focused on remedying the reasons for the child's removal); see also *In re M.W.*, 386 Ill. App. 3d 186, 200 (2008) (holding that the circuit court's decision to return the child to his mother was against the manifest weight of the evidence when the mother "had not made sufficient progress in therapy and counseling to deal with the psychiatric disorder that had prevented her from protecting [the child"]).

¶ 50    Further, the misconduct and hospital visit that Lorraine asserts are symptoms of the Children's new placements also occurred while the Children lived with Lorraine. M.P.'s mental health struggles were present before, and Lorraine herself acknowledged that M.P. would act out and was difficult to control, and M.P. going to the hospital actually precipitated one of the

previously closed DCFS cases. Additionally, A.B. reported that the reason that Lorraine had spanked her was because she had misbehaved at school, again evidencing that misconduct is not necessarily a novel development in the Children's lives.

¶ 51    Based on Lorraine's refusal to participate in her recommended services and her resulting failure to address the bases for the Children's removal from her care, the circuit court did not abuse its discretion in determining that placement with DCFS was in the Children's best interests. Therefore, we affirm the circuit court's disposition order.

¶ 52    Affirmed.