2025 IL App (1st) 242275-U

No. 1-24-2275

Order filed August 21, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | |
|---|---|
| IN RE H.B-H., A MINOR, | ) |
| | ) Appeal from the |
| (The People of the State of Illinois, | ) Circuit Court of |
| | ) Cook County. |
| Petitioner-Appellee, | ) |
| | ) No. 24-JA-0365 |
| v. | ) |
| | ) Honorable |
| Hoytissha H., | ) Andrea Buford, |
| | ) Judge Presiding. |
| Respondent-Appellant). | ) |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's ruling that the minor was neglected where the finding was not against the manifest weight of the evidence and the State presented sufficient evidence to satisfy such claims. We further affirm the trial court's ruling that it was in the best interest of the minor to be placed in the temporary custody of the Department of Children and Family Services.

¶ 2    Respondent Hoytissha H. appeals from orders of the circuit court finding her minor son

H.B-H. (H.B.) neglected due to lack of care and an injurious environment, adjudicating him a ward

of the court, and finding that Ms. H. was unable to care for, protect, train, or discipline H.B. pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)). On appeal, Ms. H. contends that the court erred in finding that H.B. had been neglected where the State presented insufficient evidence of neglect, relying entirely on the minor's medical records. She further asserts that the court erred in finding that it was in H.B.'s best interest to be placed in the temporary custody of the Department of Children and Family Services (DCFS) where the evidence showed that he is no better off in DCFS's care than he was in Ms. H.'s care. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                              I. BACKGROUND

¶ 4      H.B. was born on July 31, 2012. Ms. H. adopted H.B. as a single parent. There is no father involved in this case. On May 14, 2024, the State filed a petition for adjudication of wardship for H.B. In the petition, the State alleged that H.B. was neglected pursuant to section 2-3(1)(a) of the Act (705 ILCS 405/2-3(1)(a) (West 2024)) in that he was not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for his well-being, or other care necessary for his well-being. In support of those allegations, the State asserted that H.B. had been diagnosed with a mild intellectual disability, opposition defiant disorder, attention deficit hyperactivity disorder, and was developmentally delayed. The State contended that, per medical personnel, Ms. H. had failed to ensure that H.B. attended the appropriate medical testing and was resistant to H.B.'s recommended level of care. Medical personnel recommended residential care for H.B. and determined that H.B. was being medically neglected while in Ms. H.'s care because she would not consent to residential treatment. The State noted that on April 23, 2024, H.B. disclosed to his treating psychiatrist that Ms. H. made

him lick his own urine from the bathtub after he had accidentally soiled himself. Ms. H. had also refused to cooperate with DCFS personnel.

¶ 5      The State also alleged that H.B. was neglected in that he was subjected to an environment injurious to his welfare pursuant to section 2-3(1)(b) of the Act. 705 ILCS 405/2-3(1)(b) (West 2024). The State set forth the same factual basis to support this allegation of neglect as it did for its claim of neglect pursuant to section 2-3(1)(a). Finally, the State alleged that H.B. was abused pursuant to section 2-3(2)(ii) of the Act. 705 ILCS 405/2-3(2)(ii) (West 2024). The State set forth the same factual allegations in support of its claim of abuse. The State asked that H.B. be adjudged a ward of the court. The State also filed a motion for temporary custody of H.B.

¶ 6      Attached to the petition was an affidavit from DCFS investigator Marissa Panzarella. Ms. Panzarella averred that Ms. H had been advised multiple times that H.B. required more involved care, such as residential day programs and testing for autism, but Ms. H. refused and did not appear to be a "stable provider." Ms. H. had a pattern of behavior where she became aggressive with providers involved in H.B.'s care and denied access to H.B. According to the affidavit, H.B. had reported "consistently" that he did not feel safe with Ms. H.

¶ 7      Following a hearing where Ms. H. was present, the court entered a temporary custody order finding that probable cause existed that H.B. was abused and neglected based on the facts alleged in the petition and that H.B. should be removed from Ms. H.'s home. The court awarded temporary custody to the DCFS Guardianship Administrator with the right to place H.B.

¶ 8      Three days later, the Office of the Cook County Public Guardian (Public Guardian), on H.B.'s behalf, filed an emergency motion for placement for H.B. In support of the motion, the Public Guardian noted that DCFS had been looking into concerns regarding the lack of appropriate care for H.B. for more than a year and that his psychiatric and medical providers had expressed

concern that medication alone was not sufficient to address his behavioral concerns and diagnoses. Rather, residential care was the only recommended treatment option for H.B. On May 13, 2024, DCFS took custody of H.B. and removed him from the hospital where he had been for four days without the recommended inpatient psychiatric care. DCFS took H.B. to a DCFS administrative office in Chicago where he remained at the time of the motion. DCFS failed to place him in a residential treatment facility. H.B. had a psychiatrist appointment scheduled for May 20, 2024, but the provider cancelled the appointment citing concerns about threats from Ms. H. The Public Guardian sought an order requiring DCFS to locate an appropriate residential treatment facility for H.B. within 24 hours.

¶ 9 The court granted the motion, finding that H.B.'s placement in the DCFS office was not "necessary and not appropriate." The court ordered the Director of DCFS to place H.B. in an appropriate residential treatment center within 24 hours.

¶ 10 On June 4, 2024, the Public Guardian filed a petition for a rule to show cause against the Director of DCFS because DCFS had failed to place H.B. in a residential treatment center in accordance with the court's prior order. In the petition, the Public Guardian noted that H.B. was staying at a DCFS office between May 14 and May 24, receiving neither treatment nor education. On May 24, H.B. was moved to an emergency foster home, but the foster home offered only temporary placement and was not equipped to assist youth with extensive mental health diagnoses like H.B. H.B. became "dysregulated" at the foster home and was psychiatrically hospitalized where he remained at the time of the petition. The Public Guardian eventually withdrew its petition, and H.B. was placed at a qualified residential treatment program, Nexus Onarga Family Healing, on June 20, 2024.

¶ 11   The trial court held the adjudication hearing on the State's petition on October 20, 2024. Ms. H. was present, and an attorney appeared as her "stand by counsel." The State began by introducing certified and delegated records for H.B. from Comer Children's Hospital (Comer Hospital) as well as records of H.B.'s psychiatric appointments from Mitchell Hospital. The Comer Hospital records began in April 2013 when H.B. was 8 months old and included emergency department visits and other medical appointments. The psychiatric records detailed H.B.'s appointments from January through March 2024.

¶ 12   As relevant here, the Comer Hospital records show that H.B. had been diagnosed with attention deficit hyperactivity disorder (ADHD), predominantly hyperactive type. The records also indicated that H.B. had a "[b]ehavior problem" and potentially had fetal exposure to alcohol. The records detail H.B.'s disruptive behavior at school and Ms. H.'s concerns about his medications, including side effects and dosages. In September 2019, Ms. H. took H.B. to the emergency department "directly from a Behavioral Psych Clinical for hyperactivity concerning for self-harm." During the clinic, H.B. was hyperactive and out of control. Three adults were unable to restrain him. The clinic deemed H.B. unsafe to go home, so he was sent to the emergency department for further evaluation. The registered nurse who evaluated H.B. noted that his medications had recently been increased, but he did not show improvement. Ms. H. stated that she felt unsafe at home. Doctors recommended that H.B. be hospitalized for inpatient psychology evaluation at Hartgrove Hospital (Hartgrove), to which Ms. H. agreed. The records indicated that H.B. had previously been psychiatrically hospitalized.

¶ 13   In November 2019, H.B. was taken to the emergency department after he was disruptive at school. H.B. was reportedly hitting staff at school and refusing to comply with directions. H.B. took off his clothes and ran out into the street where he was almost struck by a vehicle. H.B. told

doctors that he was trying to hurt himself but did not explain why. H.B. was transferred to Chicago Lakeshore Hospital for inpatient psychiatric hospitalization.

¶ 14    In May 2021, Ms. H. brought H.B. to the emergency department telling hospital staff that he had become difficult to control at home. H.B. was striking her and other children. Ms. H. was told that H.B. required inpatient treatment, but she would not consent to his admission. Ms. H. stated that H.B. was compliant with his medication. A licensed professional counselor recommended that H.B. be transferred to a mental health unit for immediate inpatient psychiatric treatment due to increased physical and verbal aggression and poor insight. The counselor determined that H.B. presented a harm to himself and his mother and showed poor impulse control. H.B. was currently not in therapy because he had been deemed "too intense." Ms. H. reported that H.B. "regularly" hits and punches her. H.B. was previously attending a therapeutic school, but due to the COVID-19 Pandemic was currently attending school online. Ms. H. told hospital staff that she was scared to even touch H.B. because she feared he would hurt her. She had attempted to get services from Metropolitan Family Services and Ada S. McKinley, but both turned her away due to H.B.'s "acuity." Hospital staff noted that although Ms. H. presented strong support for H.B., she was "burnt out" from H.B.'s behavior. Ms. H. stated that she did not like inpatient services and did not receive any services after H.B. was discharged. The counselor provided Ms. H. with resources for partial hospitalization programs and intensive outpatient treatment programs. Ms. H. said she would register H.B. for one of the programs when her insurance changed because she did not currently have coverage.

¶ 15    A week after this emergency department visit, Ms. H. followed up with hospital staff by phone. She told the staff she did not want "anything to do with" the recommended inpatient psychiatric hospitals, specifically Chicago Lakeshore Hospital and Hartgrove, because she

believed they were making H.B. worse. Instead, she was waiting for an insurance change so that she could send H.B. to a therapeutic day program for the summer. The licensed social worker suggested that H.B. attend a partial hospitalization program at Hartgrove due to his increased level of agitation and the need for a higher level of care. She noted that Hartgrove offered transportation for its partial hospitalization program because Ms. H. reported that she could not transport H.B. to intake and therapy services because of her job. However, Ms. H. stated that she was not interested in Hartgrove because she was concerned about H.B. being hospitalized. The social worker contacted H.B.'s psychiatrist who confirmed that she had also encouraged H.B. to attend Hartgrove's partial hospitalization program, but Ms. H. was resistant to that level of care due to her prior experience with the hospital. H.B.'s psychiatrist stated that she would continue to encourage a higher level of care until H.B. accessed more services.

¶ 16     In January 2022, Ms. H. brought H.B. to the emergency department with complaints of leg pain, leg shaking, hand shaking, and headache. Ms. H. informed hospital staff that H.B. had recently been discharged from Hargrove after a two-month inpatient stay. She noticed when he returned home that he was shaking at random times, had slurred speech, and was confused. Doctors at the emergency department determined that the shaking was most likely a side effect from his new medication. They advised Ms. H. to follow up with H.B.'s psychiatrist.

¶ 17     Ms. H. brought H.B. to the emergency department again on May 26, 2022, after H.B. became upset when she took away his iPad after she learned that he had fought with another student at school. H.B. began punching the wall and throwing his toys. H.B. tied a shirt around his neck and told Ms. H. that he wanted to kill himself. Ms. H. told hospital staff that H.B. was consistent with his medications. A licensed clinical professional counselor followed up with Ms. H. after this visit about H.B.'s behavior. Ms. H. advised that H.B. was on a waiting list for diagnostic testing

for autism, but the waiting list was one and half years long. The counselor encouraged Ms. H. to inquire with H.B.'s school district about diagnostic testing.

¶ 18   On July 6, 2022, Ms. H. brought H.B. to the emergency department after he had an outburst on the bus home from school. When he returned home, H.B. slammed the door to his room, damaging the door. Outside the presence of Ms. H., H.B. told hospital staff that kids at school are mean to him and hit him. He said that Ms. H. occasionally spanks him if he is "bad," and Ms. H. let him wet his pants today on accident while he was in his room having the outburst. He originally told hospital staff that he did not feel safe at home, but, after further conversation, stated that he felt safe at home and wanted to return home. H.B. was not cooperative with a physical exam and refused to change out of his "clearly soiled" shirt. Ms. H. gave the impression that she was frustrated with H.B.'s repeated outbursts and did not know what else could be done.

¶ 19   Later that month, on July 30, 2022, Ms. H. returned to the emergency department with H.B. after he became upset at the park when Ms. H. would not let him ride an adult-sized bicycle. When they returned home, H.B. locked himself in his room and started punching holes in the wall with a hockey stick. Ms. H. contacted emergency services who were able to unlock the door. Ms. H. could not control H.B.'s emotional health and emergency personnel advised her to take him to the emergency department for further evaluation. H.B. told hospital staff that he wanted to hurt himself or anybody else. Ms. H. was again advised to inquire with H.B.'s school district for autism testing.

¶ 20   On August 31, 2022, H.B. was brought to the emergency department by emergency medical services personnel after he had an altercation with Ms. H. Ms. H. was not present at the hospital, but H.B. stated that she became upset with him and threatened to break his video game console. H.B. attempted to attack and punch her, and Ms. H. put her arms around his neck. H.B. said he had neck pain and reported that he had not eaten for the past couple of days and was very

hungry. Emergency department staff contacted a nurse at Hargrove who stated that they could not accept H.B. unless they received consent from Ms. H. The nurse had attempted to contact Ms. H. several times but had been unable to reach her. Ms. H. later told emergency department staff that H.B.'s aggressive behaviors were increasing and becoming concerning to the point where she did not feel safe taking him home. She explained that H.B. becomes upset when he cannot have his way and his behaviors were becoming uncontrollable. She reported that H.B. was consistent with his medications. H.B. was transferred to Hartgrove after being discharged from the emergency department.

¶ 21 On January 7, 2023, Ms. H. contacted the emergency department because she had run out of two of H.B.'s medications and needed to have them refilled.

¶ 22 On February 21, 2023, H.B. was again taken to the emergency department for his aggressive behavior. Ms. H. stated that H.B. did not want to go to individual therapy that day and started pacing and kicking doors. H.B. tied a string around his neck and Ms. H. called an ambulance to take him to the hospital. Ms. H. believed that H.B. was acting out because he was out of one of his medications that helped control his aggressive behaviors. Hospital staff recommended an intensive outpatient treatment program for H.B. H.B. had recently been discharged from Hartgrove on January 10 after a three-month stay. Ms. H. stated that although she attempted to get him to take all his medications, he had missed many doses because he either spits them out or throws them. Ms. H. further explained that H.B.'s psychiatrist had recently discontinued many of his medications; however, after reviewing H.B.'s chart, the emergency department doctor learned that H.B. was supposed to continue all his medications with some changes in dosages.

¶ 23 On May 16, 2023, H.B. had an office visit in pediatric neurology. The neurologist concluded that H.B. had some features of autism spectrum disorder (ASD) as well as ADHD and

behavioral disturbance. In order to confirm the diagnosis of ASD, he would need "ADOS" testing. If his "ADOS score" confirmed the diagnosis of ASD, he would then be able to qualify for more services. The neurologist noted that although H.B. was the age of a fifth grader, his educational level was that of a kindergartner.

¶ 24    On July 26, 2023, Ms. H. brought H.B. to Comer for a "bowel problem." Ms. H. stated that H.B. began having "stool accidents" after he was released from Hartgrove after a three-month stay. Ms. H. reported problems with Hartgrove, stating that she filed several DCFS inquiries against the facility, but DCFS found insufficient evidence after investigating. Nonetheless, Ms. H. voiced concerns about H.B.'s treatment at Hartgrove.

¶ 25    On January 8, 2024, H.B. was seen at Mitchell Hospital for a psychiatric follow-up appointment. Ms. H. reported that H.B. initially responded well to a higher dose of one of his medications, but over the holiday break his behavior once again became disruptive. In private, H.B. told the psychiatrist that he did not feel different with the medication. After discussion with Ms. H. and H.B., the psychiatrist lowered the dosage for H.B.'s Abilify prescription from 10 milligrams to 7.5 milligrams. Ms. H. reported that H.B. was on the waitlist for therapy at school. The doctor also encouraged Ms. H. to contact "ADOS McKinley" to establish therapy services, in addition to school-affiliated therapy services.

¶ 26    H.B.'s next follow-up appointment was scheduled for March 4, 2024, but Ms. H. contacted H.B.'s psychiatrist on January 29, 2024, because she was concerned that H.B. had become more irritable and aggressive at school and at home after lowering his Abilify dosage. Ms. H. reported that she had lowered his Abilify dosage to 5 milligrams, rather than the 7.5 milligrams recommended. The psychiatrist "once again" counseled Ms. H. on the benefits of a residential day program for H.B.'s ongoing dysregulation and aggressive behavior. Ms. H. expressed concern

about residential day programs based on what she had heard from others, but was counseled on the benefits, risk, and alternatives for H.B. Ms. H. stated that she would consider a residential day program and speak to H.B.'s counselor about it.

¶ 27    Ms. H. contacted H.B.'s psychiatrist again in February 2024, reporting that H.B. continued to be dysregulated and was hitting peers and teachers at school. The psychiatrist evaluated H.B. in person on February 12, 2024. H.B. reported feeling angry with peers at school who bothered him or made fun of him. He had difficulty with limit-setting at home by Ms. H. but acknowledged that she loved him and reported that she was consistent with providing him with his medications. The psychiatrist spoke to Ms. H. and "once again" emphasized the benefits of a residential day program. Ms. H. "was counseled on the benefits of a structured residential day program, as opposed to occasional, infrequent outpatient appointments." Ms. H. was informed that H.B. did not need to go to the emergency department or be admitted to an inpatient facility because he was not currently experiencing suicidal ideation or intent.

¶ 28    H.B. had his scheduled follow-up appointment on March 4, 2024; however, Ms. H. failed to adhere to the agreed-upon appointment setting. The appointment was intended to be in person with H.B. and Ms. H., but Ms. H. rescheduled the appointment to virtual. Ms. H. then did not download the Zoom application on her phone, so the psychiatrist was unable to see and evaluate H.B.

¶ 29    Ms. H. reported H.B. was still aggressive at school. School officials had recently recommended that H.B. join a residential day program. The psychiatrist likewise "strongly advised" Ms. H. to consider residential day programs. The doctors counseled Ms. H. that, in the long term, medications changes were not the only answer to H.B.'s issues, and that he needed a more involved level of care than what can be provided at home. Ms. H. refused to enroll H.B. in a

residential day program because she had heard negative things about them. Ms. H. had previously stated that the medications had been helping H.B. but now stated that H.B. had been "messed up" by the medications. Ms. H. reported that H.B. was not in therapy but was on the waitlist for therapy services affiliated with his school. Ms. H. was advised that H.B. needed to be seen in person to be properly evaluated.

¶ 30    Ms. H. brought H.B. to Mitchell Hospital on March 25, 2024, for a follow-up appointment. In private, H.B. told his psychiatrist that he continued to get in trouble at school and that he recently became very angry and threw a chair. Ms. H. stated that she felt overwhelmed and was tearful when spoken to alone. Ms. H. reported that H.B. was still not in therapy and was still on the waitlist for therapy through his school. They once had a therapist come to their home, but they had a "bad experience," and Ms. H. did not wish to continue with home therapy.

¶ 31    Doctors again counseled Ms. H. that medication changes were not the only answer for H.B.'s current issues, and that H.B. would benefit from a more involved level of care than what can be provided at home. Ms. H. again expressed hesitation about enrolling H.B. in a residential day program. The doctors encouraged her to acquire more information and learn about the programs.

¶ 32    On May 9, 2024, Ms. H. brought H.B. to Comer Hospital, reporting that over the past month H.B. had demonstrated "increased disruptive, explosive behavior." H.B. had been kicked out of school for fighting with other students and had started at a new school two days prior. Ms. H. was worried about her safety at home because when H.B. gets upset he threatens to harm her and curses at her. Ms. H. noted that H.B. had been increasingly agitated and aggressive since his medication had been adjusted. H.B. reported auditory hypnagogic hallucinations but denied visual

hallucinations. "Synergy" recommended inpatient psychiatric hospitalization for H.B. Ms. H. "deflected" and later "said no" to admission to Ascension and Hartgrove.

¶ 33 H.B. had also disclosed to his outpatient psychiatric provider that he recently had an accident in the bathtub and Ms. H. made him lick the bathtub. He also stated that Ms. H. tells him that she hates him, curses at him, and that he can "leave when [he] is 18." Based on these statements, the psychiatric provider contacted DCFS, "specifically for concern of mom's care for inadequate medical care."

¶ 34 H.B. later reported that he did not feel safe at home and that Ms. H. had been physically and emotionally abusive. He stated that he became upset a few days before his current hospitalization at the emergency department and hit his head on the wall. Ms. H. grabbed him and threw him to the ground, hurting his neck. Ms. H. told him that she wished he were no longer her son. Ms. H. had also been punishing him by forcing him to sleep on the floor without a pillow or blanket.

¶ 35 H.B. remained at Comer for three days. A psychiatric consult was called to evaluate H.B.'s need for inpatient psychiatric hospitalization. The psychiatric consult observed that H.B. had been at Comer for 65 hours without behavioral issues. Ms. H. was initially present at H.B.'s bedside when he was admitted, but she left and did not return. The psychiatric consult noted that H.B. had been treated with medications and therapy and residential day programs had been recommended, but Ms. H. had not followed through. H.B. reported "recurrent physical and emotional abuse." The consult concluded that H.B. would likely benefit from therapy and/or residential day programs as had been previously recommended, but there was no indication for inpatient psychiatric hospitalization at this time.

¶ 36    On May 13, 2024, Marissa Panzarella from DCFS arrived at Comer to interview H.B. According to a note from a licensed clinical social worker, H.B. was evaluated and recommended for inpatient hospitalization by "Synergy." However, the note continued that "Synergy has exhausted all [inpatient] psychiatric hospital referral options and [H.B.] has been deflected from ALL." The social worker spoke with Ms. Panzarella who reported that DCFS had opened multiple cases against Ms. H., and she had demonstrated behaviors that were consistent with medical neglect. According to DCFS, Ms. H. had refused needed medications, treatment options, missed H.B.'s outpatient psychiatric appointments and "overall [was] a barrier to [patient] care."

¶ 37    DCFS planned to take protective custody of H.B. due to medical neglect. H.B. required inpatient hospital admission due to no safe discharge and requested that the social worker call the DCFS hotline to inform them that H.B. had been deflected from all inpatient psychiatric hospitals and "cert to be exhausted [due to] no accepting facility." DCFS would file a motion for custody on Monday, May 13, 2024, and it would likely be four or five days before a safe disposition plan could be established.

¶ 38    After introducing the medical records into evidence, the State indicated that it was withdrawing the allegation of abuse, substantial risk of injury, and would procced only on the allegations of neglect for injurious environment and necessary care.

¶ 39    Ms. Panzarella testified that she is a child protection investigator for DCFS. She was assigned to H.B.'s case in April 2024 when DCFS received a hotline call of medical neglect and substantial risk of physical injury, and/or environment injurious to health and welfare. Ms. Panzarella spoke to Ms. H. by phone on April 5, 2024. Ms. H. indicated that H.B. was not participating in a "partial hospitalization program" because she did not have a way of transporting him back and forth because of her job. Ms. Panzarella asked Ms. H. to bring H.B. to a doctor for

an evaluation, but she refused, stating that nothing was wrong with him. Ms. Panzarella went to H.B.'s school where she spoke to him in private. H.B. indicated that he felt safe at home and denied that Ms. H. hit him. He said she punished him by taking his phone and other privileges.

¶ 40    Shortly thereafter, DCFS received another hotline call regarding Ms. H. and H.B. On April 8, 2024, Ms. H. left a voicemail for Ms. Panzarella where she denied the allegations, used "curse words," and threatened to contact Ms. Panzarella's supervisor. She further stated that she would "whoop [Ms. Panzarella's] a** too." Ms. Panzarella attempted to make appointments with Ms. H. so that she could meet with her and H.B., but Ms. H. failed to keep any of the appointments.

¶ 41    On May 10, 2024, Ms. Panzarella spoke to H.B. in private at Comer Hospital. H.B. told her that Ms. H. would take part of the blind and hit him with it. He also told her about the bathtub incident where he had an accident in the bathtub and Ms. H. made him lick the bathtub. Ms. Panzarella took protective custody of H.B. on May 13, 2024. Ms. Panzarella told H.B. that he would not be returning home. H.B. did not seem bothered by the fact that he was not going to go home and said he did not feel safe at home.

¶ 42    Ms. Panzarella explained that she took protective custody of H.B. because of multiple concerning patterns surrounding his medical care. H.B. had a longstanding history of mental health issues, and Ms. H. was given multiple recommendations for his care that she did not follow through on. Specifically, H.B. was recommended for partial hospitalization and residential treatment. Ms. Panzarella spoke with the "medical team," who indicated that, based on the level of care H.B. required, the level of care he was receiving constituted medical neglect. There were also concerns about Ms. H.'s ability to follow through on the level of care required. Ms. Panzarella noted that this medical neglect was compounded by the statement H.B. made about being forced to lick the bathtub after having an accident, which he had repeated to different providers on different

occasions. Ms. Panzarella testified that, based on H.B.'s conditions, he needed to be treated in a residential setting, but Ms. H. refused to send him to a residential facility. She noted that by May 2024, H.B. was no longer attending his therapeutic school after he was asked to leave due to behavioral problems. School officials felt that H.B. needed a residential or stricter school environment. Ms. Panzarella further testified that Ms. H. had been offered intact services by DCFS, but she had failed to successfully complete them due to noncompliance.

¶ 43    Ms. Panzarella explained that Ms. H. and H.B. were in a cycle where she would run out of his medications, his behavior would escalate, and then she would take him to the emergency department. At his most recent admission, doctors recommended that H.B. be transferred to an inpatient facility for psychiatric hospitalization, but Ms. H. declined because she did not accept the location.

¶ 44    Following Ms. Panzarella's testimony, the State rested. Ms. H. did not present any evidence. In closing argument, the State contended that Ms. Panzarella's testimony and the medical records showed that H.B. had an established history of impulsivity and hyperactive behavior. H.B. had been treated with medication, but doctors had repeatedly recommended therapy and residential day programs. Despite these recommendations, Ms. H. had repeatedly failed to follow through. The State argued that it was clear that H.B. was suffering and needed a higher level of care that Ms. H. refused to allow or provide. The State concluded that these circumstances showed a neglect of necessary care and an injurious environment.

¶ 45    The Public Guardian likewise pointed out that the medical records showed that numerous healthcare providers had recommended an increased level of care for H.B., but Ms. H. failed to follow through. The Public Guardian noted that the relevant inquiry at the adjudicatory hearing is the status of the child, not the conduct of the parent. Although Ms. H. may have been overwhelmed

and had conflicting feelings about the recommended treatment options, her failure to obtain the treatment H.B. required led to his continued deterioration. The Public Guardian concluded that Ms. H.'s failure to secure the necessary psychological care for H.B. showed a lack of concern that rose to the level of neglect of necessary care and an injurious environment.

¶ 46    Ms. H. was sworn in and responded to the closing arguments by way of narrative. She testified that H.B. made every psychiatrist and doctor's appointment. She testified that a neurologist tested H.B. for autism and also attended an individualized education program meeting at H.B.'s school. The neurologist said at that meeting that H.B. was not ready for a residential setting. Ms. H. further testified that H.B.'s regular psychiatrist told her to hold off on enrolling H.B. in residential schooling because he was not ready for it yet. She testified that she never prevented H.B. from getting the treatment that he needed, but she wanted to learn about residential schooling before sending him there.

¶ 47    She stated that because of her job, she was unable to transport H.B. to the partial hospitalization programs after he got kicked off the bus for fighting. She denied making him lick his own urine from the bathtub and denied hitting him. She maintained that she always followed the doctors' recommendations and was consistent with his medication.

¶ 48    The court found that the State met its burden by a preponderance of the evidence to establish that H.B. was neglected due to lack of care and neglected due to an injurious environment. H.B. reported that Ms. H. hit him with a cord from the blinds, made him lick the bathtub when he had an accident, and had thrown him on the floor. He also stated that Ms. H. told him that she hated him, that he could leave when he turned 18, and that he did not feel safe at home. H.B. had suffered multiple mental health diagnoses and had threatened self-harm, but Ms. H. failed to follow up on the required treatment, including residential treatment. Ms. H. also failed to provide H.B.

with medication, causing his behavior to escalate. The court also noted that Ms. H. was offered intact services by DCFS and failed to comply.

¶ 49    The court then proceeded to the dispositional hearing. The court first took judicial notice of the evidence and findings from the adjudication hearing. The State introduced a DCFS integrated assessment dated September 6, 2024, and a DCFS family service plan dated July 12, 2024. The service plan indicated that H.B.'s case came to the attention of the court and DCFS due to Ms. H.'s failure to adequately address H.B.'s medical and mental health needs. Specifically, Ms. H. failed to ensure that H.B. attended the appropriate medical testing to rule out other mental health diagnoses and was resistant to the recommended level of care. At the time the service plan was drafted, H.B. was in a residential treatment center, but was "currently struggling pretty bad." H.B. was attempting to run from the facility, fighting with peers, and was physically aggressive toward the staff.

¶ 50    The service plan further indicated that Ms. H. was refusing to comply with DCFS's recommendations. She also made physical threats of violence against two of the DCFS caseworkers and refused to take a mental health assessment. The goal of the service plan was to reunite Ms. H. and H.B. after Ms. H. completed the recommended individual services, including a mental health assessment, parenting classes, and supervised visits with H.B.

¶ 51    The integrated assessment detailed interviews with Ms. H. and H.B. by La Rabida Children's Hospital Clinical Screener and Licensed Clinical Social Worker, Quinlan Draper, and DCFS Permanency Worker Karen Hall. Ms. H. was "noticeably distracted" during portions of her interview and displayed characteristics of a mental illness, though she had never been formally diagnosed. Ms. H. stated that H.B. began demonstrating "concerning behaviors" when he was three or four years old. He was diagnosed with ADHD and started taking medication. H.B.'s daycare

teachers reported that he was difficult to teach and would not sit still. Some of his teachers suggested that he get tested for autism. Ms. H. reported being frustrated with H.B.'s doctors because they diagnosed him with autism and only treated his autism, but nothing else until he was older. H.B. was later diagnosed with bipolar disorder, a learning disability, and an intellectual disability. Ms. H. did not take H.B. for further autism testing as recommended because she did not think he was on the autism spectrum since he was always able to make eye contact.

¶ 52    A parent support group and a parenting capacity assessment were recommended for Ms. H., and therapy and a psychological evaluation were recommended for H.B. Ms. H. contacted the support group but did not follow through and was inconsistent with H.B.'s mental health treatment. In March 2023, Ms. H. told DCFS that she no longer wanted to engage in therapy and was "done" with the Intact Family Program because it was not helpful to her or H.B. Despite her frustrations with H.B.'s mental health needs, Ms. H stated that she did everything for him and loved being a parent. Ms. H. did not believe that she needed parenting classes because she was a "good parent," but expressed interest in other services that would help her handle H.B.'s specific needs. After the interview, a number of recommendations were made for Ms. H., including individual therapy, parenting classes, and transportation and housing assistance.

¶ 53    During H.B.'s interview, he stated that being away from Ms. H. made him feel "sad." He liked spending time with Ms. H. and his extended family. H.B. was receiving individualized care at Nexus Organa and had to be separated from his peers. H.B.'s care coordinator at Nexus Organa stated that H.B. required a high level of care, constant supervision, and one-on-one support in a locked facility due to his eloping behavior. H.B. was open to therapy and medication in the future. The assessment recommended continued therapy and mental health treatment for H.B.

¶ 54    Ms. Hall, the DCFS Permanency Worker assigned to Ms. H. and H.B.'s case, testified at the dispositional hearing. Ms. Hall testified that H.B. was currently in a residential treatment facility and the facility was safe and appropriate. H.B. was receiving individual therapy three times a week, meeting with a psychiatrist once a month, and taking psychotropic medications. H.B. was previously making progress, but his behavior had declined in the past month. The treatment facility was addressing his declining behavior and Ms. Hall did not have any concerns with the treatment that H.B. was receiving.

¶ 55    Ms. Hall further testified that Ms. H. had been assessed for services and was found to be in need of a parenting capacity assessment, individual therapy, psychological assessment and treatment, "NPP," and a mental health evaluation. Ms. H. had indicated a willingness to participate in the psychological assessment and was on a waitlist of parenting classes. Once Ms. H. completed the psychological assessment, DCFS would arrange visitation between her and H.B. The visits would be supervised and take place at a secure location. Ms. Hall reported that DCFS had "staffed" whether it was in H.B.'s best interest that he be made a ward of the court. Ms. Hall believed that it was in H.B.'s best interest that H.B. be made a ward of the court because he needed continued residential treatment.

¶ 56    The court found that it was in H.B.'s best interest that he be adjudged a ward of the court. The court found Ms. H. unable only, noting that she had a psychiatric evaluation scheduled and was on the waitlist for parenting classes. The court found that H.B. required continued residential treatment and reasonable efforts at this time could not prevent or eliminate the need for H.B.'s removal from the home. The court set a goal of return home in 12 months. Ms. H. filed a *pro se* timely notice of appeal. We find that we have jurisdiction to consider the merits of this appeal. Ill. S. Ct. Rs. 303(a)(1) (eff. July 1, 2017); 311(a) (eff. July 1, 2018).

¶ 57                                     II. ANALYSIS

¶ 58     On appeal, Ms. H. contends that the trial court's findings that H.B. was neglected due to lack of care and that he was neglected due to an environment that was injurious to his welfare were against the manifest weight of the evidence. Ms. H. asserts that the medical records were the only competent evidence presented regarding H.B.'s medical care and they do not support the proposition that H.B. was medically neglected. She further maintains that the court's ruling that it was in H.B.'s best interests to make him a ward of the court and place him in the care of DCFS was against the manifest weight of the evidence.

¶ 59                              A. The Juvenile Court Act

¶ 60     The Act sets forth a two-step procedure for trial courts to follow in deciding whether minors should be removed from their parents' custody and made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is an adjudicatory hearing on the petition for adjudication of wardship where the court considers only the question of whether the minor is abused, neglected, or dependent. *Id.* ¶ 19 (citing 705 ILCS 405/2-18(1) (West 2010)). If the trial court determines at the adjudicatory hearing that a minor is abused, neglected, or dependent, the trial court proceeds to step two, the dispositional hearing. *Id.* ¶ 21. "At the dispositional hearing, the trial court determines whether it is consistent with the health, safety and best interests of the minor and the public that the minor be made a ward of the court." *Id.* Ms. H. raises challenges to the trial court's findings at both the adjudicatory and dispositional hearings in this case. Accordingly, we will address each hearing in turn.

¶ 61                           B. The Adjudicatory Hearing

¶ 62     Here, following the adjudicatory hearing, the court found that H.B. was neglected due to lack of care and an injurious environment subject to sections 2-3(1)(a) and 2-3(1)(b) of the Act.

"Neglect" is generally defined as the " 'failure to exercise the care that circumstances justly demand.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000)). However, "neglect" has a "fluid meaning" and includes willful as well as unintentional disregard of duty. *Id.* "Similarly, the term injurious environment has been recognized by our courts as an amorphous concept that cannot be defined with particularity. [citations]. In general, however, the term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *Id.* (quoting *In re N.B.*, 191 Ill. 2d at 346). As such, cases involving allegations of neglect and adjudication of wardship must be decided based on their unique circumstances. *Id.* The State bears the burden of proving the allegations of abuse or neglect by a preponderance of the evidence and we will not reverse a trial court's finding of neglect unless it is against the manifest weight of the evidence. *Id.* at 463-64. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.* at 464.

¶ 63    Ms. H. first contends that the court's finding that H.B. was neglected because he was not provided the recommended level of medical care was against the manifest weight of the evidence. She asserts that the only witness at the adjudicatory hearing, Ms. Panzarella, was not qualified to testify regarding H.B.'s medical condition and had no personal knowledge of his medical history. Ms. H. acknowledges that H.B.'s medical records were properly admitted but asserts that the records do not show by a preponderance of the evidence that H.B. was medically neglected.

¶ 64    Ms. H. argues that to the extent Ms. Panzarella testified to H.B.'s medical condition, such testimony should not have been admitted pursuant to Illinois Rules of Evidence 602 and 703. Ill. Rs. Evid. 602 (eff. Jan. 1, 2011), 703 (eff. Jan. 1, 2011). Ms. H. acknowledges that she failed to

preserve this claim of error by objecting to the testimony below or raising the issue in a post-judgment motion but asks us nonetheless to review the issue under the plain error doctrine.

¶ 65     Generally, an issue that was not objected to during the trial is forfeited on appeal. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41. The plain error rule, however, allows a reviewing court to consider an unpreserved error where either: "(1) a clear or obvious error occurs and the evidence is so closely balanced that such error threatens to tip the scales of justice against the accused, regardless of the seriousness of the error or (2) a clear or obvious error occurs and the error is so serious that it affects the fairness of the trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence." *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 51. The first step in a plain error analysis is to determine whether any error occurred. *Id.* If no clear or obvious error occurred, we need not conduct a plain error analysis. *Id.*

¶ 66     Illinois Rule of Evidence 602 provides that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony." Ill. R. Evid. 602 (eff. Jan. 1, 2011). Illinois Rule of Evidence 703 concerns the testimony of expert witnesses and provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Ill. R. Evid. 703 (eff. Jan. 1, 2011).

¶ 67     First, we note that Ms. Panzarella was not qualified as an expert in this case and did not offer expert opinion testimony. Thus, it is unclear how Rule 703 is implicated in this case. Ms. H. seems to suggest that Ms. Panzarella was not qualified to refer to H.B.'s medical history at all

because she had no personal knowledge of his medical history and was not a doctor. A review of Ms. Panzarella's testimony, however, shows that to the extent she discussed H.B.'s medical history and conditions, such testimony was offered only to show her course of investigation and her examination of H.B.'s medical records where medical professionals recommended a higher level of care for H.B. Ms. Panzarella did not offer an expert medical opinion that H.B. required a certain level of care that Ms. H. had neglected to provide. Her reference to the medical records, which, as Ms. H. acknowledges, were properly certified and admitted, was made to show how she learned that medical professionals were recommending a level of care for H.B. and that Ms. H. was failing to provide that care, necessitating DCFS's involvement. With regard to Ms. Panzarella's testimony pursuant to Rule 602, Ms. Panzarella detailed her personal knowledge of H.B.'s circumstances where she testified that she had conversations with Ms. H. and H.B. She also spoke to H.B.'s care team and school officials. Accordingly, we find no error with regard to Ms. Panzarella's testimony warranting plain error review.

¶ 68 Nevertheless, Ms. H. contends that the medical records, standing alone, do not support the trial court's finding that H.B. was medically neglected. She points out that the records show that she was attentive to H.B.'s medication and followed the suggested recommendations for treatment. She acknowledges that she expressed concerns about residential care based on past negative experiences, but the records show that she agreed to learn more about the programs. She asserts that there was a difference of opinion among H.B.'s medical providers about the proper course of treatment and the State was required to present expert medical testimony to meet its burden.

¶ 69 Here, the medical records showed that H.B. required numerous medications and specialized care due to multiple medical issues, including ADHD, behavioral problems, and potentially autism. H.B. was prescribed a variety of medications to treat these conditions and

required several inpatient psychiatric hospitalizations in addition to extensive outpatient care. Ms. H. was inconsistent with his medications, sometimes reporting difficulty with getting him to take the medication, occasionally running out of medication and contacting the emergency department for refills, lowering H.B.'s dosages below what had been recommended by doctors, and on one occasion misunderstanding which medications H.B. was supposed to continue and which he was supposed to discontinue. The records showed that Ms. H. was consistently unable to regulate H.B. and would take him to the emergency department or call emergency services to transport him to the emergency department when she could not control his behavior at home. Ms. H. also failed to obtain the recommended autism testing and therapy for H.B. despite repeated recommendations.

¶ 70    Meanwhile, H.B.'s doctors and psychiatrists were continually recommending that H.B. needed a higher level of care than what Ms. H. could provide at home. Doctors advised Ms. H. that medications alone were not sufficient to treat H.B. in the long term and he required admission to a residential treatment program. In May 2021, two different professionals recommended that Ms. H. enroll H.B. in a partial hospitalization program or intensive outpatient treatment. In January 2024, a psychiatrist "once again" told Ms. H. that H.B. would benefit from a residential treatment program. Over the next several months, multiple doctors repeated this recommendation and urged Ms. H. to seek more information about the programs. Despite these continued recommendations, Ms. H. continued to express apprehension about these programs based on past experiences with them. This reluctance to provide H.B. with the treatment that doctors believed he needed culminated in H.B.'s hospitalization on May 9, 2024, where doctors initially recommended inpatient psychiatric hospitalization, but eventually released H.B. into the custody of DCFS. The records thus show that even when Ms. H. was consistent with H.B.'s medications, multiple medical professionals recommended a more involved level of care to treat his conditions. We cannot say

that it was against the manifest weight of the evidence for the trial court to find that Ms. H.'s refusal to provide that care constituted neglect due to lack of care.

¶ 71     We find this court's decision in *In re Adam B.*, 2016 IL App (1st) 152037 instructive. *Adam B.* involved three minors, but the circumstances of Joshua B. most closely resemble those present in the case at bar. Joshua had been diagnosed with opposition defiant disorder, attention deficit hyperactivity disorder, and impulse control disorder. *Id.* ¶¶ 7, 22, 25. Joshua's medical history was presented to the court in part through the testimony of a DCFS social worker and in part through Joshua's certified and delegated therapy and hospital records. *Id.* ¶¶ 5, 22-23, 25-28. Joshua's medical records revealed that he was aggressive at home, even harming his siblings. *Id.* ¶ 22. Joshua was psychiatrically hospitalized and exhibited physical aggression, impulsivity, homicidal ideation, and audiovisual hallucinations. *Id.* ¶ 23. Joshua had been suspended from school for fighting with peers. *Id.* ¶ 26. During an in-home visit, Joshua's mother told the DCFS social worker that Joshua was not seeing a therapist as had been recommended and that he refused to take his psychotropic medication. *Id.* ¶ 9.

¶ 72     Shortly after Joshua was discharged from his initial psychiatric hospitalization, he was readmitted due to increased aggression. *Id.* ¶ 27. Upon admission, Joshua was diagnosed with episodic mood disorder and the medical staff recommended a partial day hospitalization for his aggression. *Id.* ¶ 28. However, Joshua was ultimately discharged from the day program for nonattendance. *Id.* The trial court found that Joshua was neglected due to lack of care and due to an injurious environment, and abused. *Id.* ¶ 30.

¶ 73     On appeal, this court determined that the trial court's finding that Joshua was abused and neglected was not against the manifest weight of the evidence. *Id.* ¶¶ 36, 38. The court found that the record showed that Joshua's mental health was "unstable" and his mother's failure to follow-

up with his mental health services created a substantial risk of injury for himself and for his siblings. *Id.* ¶ 38. The court noted that the record indicated that Joshua had been psychiatrically hospitalized twice for increased aggression, and his mother did not follow-up with the recommendations and treatments for his mental needs. *Id.* As a consequence, Joshua's aggression increased. *Id.* After his initial hospitalization, his mother failed to ensure that he was taking his medications and failed to comply with the discharge plan that Joshua see a therapist. *Id.* ¶ 39. This resulted in a second hospitalization due to his increased behavioral problems. *Id.* After he was discharged, his mother failed to ensure that Joshua attended his partial day program sessions. *Id.* The court found that Joshua's untreated medical issues and his mother's failure to follow-up with his mental health needs created a substantial risk of injury for him and his siblings, supporting the trial court's finding that Joshua was neglected due to lack of care and an injurious environment. *Id.* ¶¶ 39-40. "A child who does not receive appropriate medical evaluations or care is neglected." *Id.* ¶ 38 (citing *In re Stephen K.*, 373 Ill. App. 3d 7, 20 (2007); *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 7).

¶ 74    Here, like Joshua, H.B. was psychiatrically hospitalized on multiple occasions. Ms. H., like Joshua's mother, was repeatedly counseled on the importance of addressing H.B.'s mental health needs through therapy, medication, and admission to a residential treatment program. Despite these recommendations, Ms. H. routinely failed to provide H.B. with his medications, failed to ensure that he was attending all his therapy appointments, and refused to enroll him in a residential treatment program. This failure to follow-up on his mental health needs resulted in H.B.'s increased behavioral problems requiring that he be psychiatrically hospitalized three times and repeated emergency department visits when Ms. H. could not control his behavior at home. H.B. therefore did not receive appropriate medical evaluations or care.

¶ 75    Ms. H. nonetheless contends that expert testimony was required to prove medical neglect in this case where the medical records showed a difference of opinion as to the whether H.B. required psychiatric hospitalization in May 2024 and revealed that Ms. H. had a "rational basis" for her reluctance to enroll H.B. in a residential day program. First, we observe that this court has held that "there is no statutory requirement or Illinois case law ruling that requires a finding of medical neglect to be supported by expert medical testimony." *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 7.

¶ 76    In any event, the records do not show a difference of opinion on the recommended course of treatment. Upon H.B.'s admission to the emergency department on May 9, 2024, he was initially recommended for psychiatric hospitalization, but only two facilities would accept him. Ms. H. refused to permit his admission to either facility. After H.B. remained at Comer for a few days without further incident, a psychiatric consult determined that psychiatric hospitalization was no longer indicated. That same psychiatric consult noted, as numerous other medical personnel had previously done, that H.B. would benefit from a residential day program. There was no difference of opinion from H.B.'s care providers about whether he would benefit from a residential treatment program. Although Ms. H. may have been reluctant to send H.B. to such a program, the focus at the adjudicatory hearing is solely on whether the minor has been neglected, not whether the parent or parents are neglectful. *In re A.P.*, 2012 IL 113875, ¶ 19-20 (citing *Arthur H.*, 212 Ill. 2d at 465, 67). Thus, the only question for the trial court at this stage was whether H.B. was receiving the medical treatment that he needed, not whether Ms. H.'s reasons for refusing that treatment were rational or not. In this case, the medical records clearly show that H.B. did not receive recommended medical evaluations or care and therefore we cannot say that the trial court's finding of neglect due to lack of care was against the manifest weight of the evidence.

¶ 77 Ms. H. also challenges the trial court's finding of neglect due to an injurious environment based on insufficient evidence that H.B. was physically or mentally abused. She asserts that this finding was based on the single allegation that she made H.B. lick urine from the bathtub, which was an uncorroborated, hearsay statement. Contrary to Ms. H.'s allegations, a finding of "injurious environment" does not require a showing of actual harm. *In re K.F.*, 2023 IL App (1st) 220816, ¶ 49. "In other words, courts need not wait for a child to get hurt." *Id.* The statutory provisions require only that the State show an injurious *environment* or substantial *risk* of harm to support a finding of neglect. *Id.* (citing *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 35). In this case, there was ample evidence in the medical records showing or alluding to physical and mental abuse demonstrating that Ms. H.'s conduct, at a minimum, posed a risk that H.B. would be subjected to an injurious environment, which was sufficient to support the court's ruling. *Id.* ¶ 52 ("an injurious environment may be found based on parental conduct that poses a risk, even if a child has not yet suffered any harm.").

¶ 78 We also reject Ms. H.'s contention that H.B.'s statements to doctors about Ms. H.'s treatment of him were inadmissible hearsay. These statements were made to doctors for the purposes of medical diagnosis or treatment, which are excepted from the rules against hearsay. Illinois Rule of Evidence 803(4)(A) (eff. Jan. 25, 2023) provides that statements "describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the hearsay rule. Therefore, the statements in the medical records by Ms. H. or H.B. indicating why H.B. was brought to the emergency room would fall within this category. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 27. Thus, we find no error in the admission of those statements.

¶ 79   Finally, Ms. H. contends that there was no competent evidence submitted at the adjudication hearing supporting a finding that she needed intact services offered by DCFS, and even if she did, declining to participate in such services does not constitute an independent, *per se* basis for supporting an adjudication that a minor is abused or neglected. Ms. H. observes that Ms. Panzarella testified that Ms. H. was offered intact services, but declined them, but she asserts that this testimony was hearsay. Ms. H. acknowledges that she failed to preserve this error for review by objecting to the testimony at trial but asserts that we can review the issue as one of plain error.

¶ 80   We find no error occurred here where the trial court's finding of neglect was not solely based on Ms. H.'s refusal to participate in intact services. Here, the court explained its findings of neglect were based on H.B.'s report that Ms. H. hit him with a cord from the blinds, made him lick the bathtub after he had an accident, and had thrown him to the floor. The court also noted that despite H.B.'s multiple mental health diagnoses, Ms. H. had failed to follow up on the required treatment, including residential treatment. The court made these findings in addition to noting that Ms. H. was offered intact services and failed to comply. This failure to comply is relevant to court's ruling when considered in conjunction with the other factors mentioned above. See *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 100 ("We reject [the mother's] argument that the refusal to participate in intact services can never be relevant at an adjudicatory hearing. *** In *In re Adam B.*, 2016 IL App (1st) 152037, ¶ 36, we noted that the mother's failure to provide necessary medical care for her children, "*as well as her noncompliance with intact services*" (emphasis added) constituted sufficient evidence that all the minors were abused due to a substantial risk of physical injury and neglected due to an injurious environment."). Here, the findings of neglect were based primarily on Ms. H.'s failure to provide the recommended level of medical care for H.B. and the injurious environment to which he was subjected. The court's reference to Ms. H.'s refusal to

participate in intact services was simply further support its ruling. Accordingly, we find that the court's adjudication that H.B. was neglected due to lack of care and injurious environment was not against the manifest weight of the evidence.

¶ 81                                  C. The Dispositional Hearing

¶ 82    Turning to the dispositional hearing, Ms. H. contends that the court's finding that it was in H.B.'s best interests to be placed in care of DCFS was against the manifest weight of the evidence. Ms. H. asserts that the evidence presented at the dispositional hearing showed that H.B.'s life had not improved or stabilized since being placed in the temporary custody of DCFS but had become worse. Ms. H. points out that H.B. was initially being housed in a DCFS administrative office building, requiring the Public Guardian to file two motions asking DCFS to obtain appropriate placement for H.B. She also asserts that Ms. Hall's testimony demonstrated that H.B. was not doing well in the residential facility.

¶ 83    As noted, at the dispositional hearing, the trial court determines whether "it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court." *In re Z.L.*, 2021 IL 126931, ¶ 60 (citing 705 ILCS 405/2-21(2) (West 2018)). The circuit court may commit the minor to wardship and place guardianship and custody with DCFS if the court determines that "(1) the minor's parents are unfit or unable for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so and (2) the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." *In re V.S.*, 2023 IL App (1st) 220817, ¶ 63. "The party requesting a finding that a parent is unable to care for, protect, train or discipline her children must establish the parent's inability by a preponderance of the evidence." *In re Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23. The primary consideration at the dispositional hearing is the best

interests of the minor. *In re V.S.*, 2023 IL App (1st) 220817, ¶ 63. We will reverse the trial court's determination only if its factual findings are against the manifest weight of the evidence, or if the court abused its discretion by selecting an inappropriate dispositional order. *Id.* ¶ 64.

¶ 84    In this case, the evidence presented indicated that Ms. H. needed services such as individual therapy, a mental health assessment, parenting classes, and a parenting capacity assessment. At the time of the hearing, Ms. H. had not completed these services. Because of this, Ms. H. had not yet begun supervised visits with H.B. The evidence also showed that Ms. H. had at times refused to cooperate with DCFS and declined to participate in some of the recommended services. Ms. Hall testified at the hearing, however, that Ms. H. expressed a willingness to participate in the psychological assessment and was on a waitlist for parenting classes. Once the assessment was complete, DCFS would arrange supervised visitation with H.B. Because Ms. H. has not yet completed the recommended services and had begun supervised visitation with H.B., the evidence supports the trial court's finding that Ms. H. is unable to care for, protect, train or discipline H.B. and that it is in H.B.'s best interest to place him in the temporary custody of DCFS. *Id.* ¶ 65 (affirming the trial court's order granting custody of the minor to DCFS where the State presented evidence that the respondent needed, but had not completed the recommended services at the time of the hearing); *In re Malik B.-N.*, 2012 IL App (1st) 121706, ¶ 60 ("Because respondent has not completed individual therapy, the evidence supports the court's finding that respondent is unable to care for, protect, train or discipline [the minor] for reasons other than financial circumstances alone and that the health, safety, and best interests of [the minor] will be jeopardized if he is in her custody at this time.").

¶ 85                                III. CONCLUSION

¶ 86    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 87     Affirmed.